**People of the State of Illinois, Plaintiff-Appellee, v. Jack W. Richards, Defendant-Appellant.**

Gen. No. 69–77.

Second District.

March 17, 1970.

315

316

John T. Perry, of Wheaton, for appellant.

William V. Hopf, State's Attorney of DuPage County, of Wheaton, and Ralph J. Gust, Jr., Assistant State's Attorney, for appellee.

MR. PRESIDING JUSTICE THOMAS J. MORAN delivered the opinion of the court.

Defendant, Jack W. Richards, was indicted for the murder of his wife; a jury found him guilty and recommended the death penalty. The court entered judgment

upon the finding of guilt, but sentenced defendant to a term of 99 to 150 years.

The appeal raises issues of the validity of the indictment, the sufficiency of the evidence, and claims prejudicial pretrial and trial errors. Error is also charged in the failure to grant a new trial on purported newly-discovered evidence. In any event, it is urged that the sentence is excessive.

The indictment charged, in Count I:

". . . that on or about the 3rd day of February, A. D. 1967, at and within DuPage County, Illinois, JACK W. RICHARDS committed the offense of MURDER in that he, without lawful justification, and with intent to kill LEONE V. RICHARDS, caused her to remain within a garage which became filled with carbon-monoxide gas, thereby causing the death of said LEONE V. RICHARDS, in violation of Illinois Revised Statutes 1965, Chapter 38, Section 9–1 (a) (1). . . ."

and, in Count II, charged the defendant with the murder in that he:

". . . without lawful justification caused LEONE V. RICHARDS to remain within a garage which became filled with carbon-monoxide gas knowing that such an act creates a strong probability of death and did cause the death of said LEONE V. RICHARDS, in violation of Illinois Revised Statutes 1965, Chapter 38, Section 9–1 (a) (2). . . ."

Robert P. Troy, a police officer and State's witness, testified that he arrived at the defendant's home at about 10:00 p. m. on February 3, 1966, as the result of a radio communication. Defendant and a neighbor were at the front door and directed him to the kitchen, where he found the deceased lying on her back on the floor. He described the deceased's clothing, observed that there

were no marks on the exposed portion of the body and that the body appeared cold; that one arm was extended to the right side of the face, "up in the air," and was stiff. After aiding in the removal of the body, he returned and examined the garage which was separate from the house.

There was a Ford backed into the garage, the ignition in the "off" position; he started the car and stated that it idled fast. He kicked the gas pedal several times but the idle remained the same. On the seat in the car, he observed some money, a purse-type wallet (later identified as belonging to the decedent), a glove and a remote control garage door opener. He observed that the radiator was warm; that the window on the driver's side was rolled one-third of the way up and the fuel indicator in the car showed there to be approximately a half tank of fuel remaining. The path to the garage from the house had snow and ice on it and he did not know whether it had been shoveled or trod down.

Troy further testified that while he was in the garage, he took the small remote control device from the front seat of the car and accidentally tripped it; the garage door started to come down and the overhead light in the garage went off. He pushed the control three or four times to stop the door from going down, but it did not stop. He found a light switch within the garage, but it did not work; thereafter, he pushed the control-device button again and the garage door went back up and the light went on.

Robert Ryan, then a sergeant in the Elmhurst police department, testified that he accompanied officer Troy to the defendant's residence on February 3rd; confirmed Troy's testimony as to the position of the body and its condition. He drove the defendant and his brother-in-law to the Elmhurst Hospital. When they arrived at the hospital, Ryan testified, the defendant was depressed

and upset and he recalled the defendant saying, "Tell me she isn't dead."

At the hospital, Ryan directed Officer Hargraves to bring the defendant to the police station, where he took an oral statement. Ryan testified that defendant told him that he and his wife had gone for a drive in the afternoon; that his wife left the house at approximately 7:00 p. m. to go shopping, and he was downstairs watching television; that he had asked his wife to put their second car, a Dodge, which was parked in the front of the house, in the garage when she returned; that he had worked on the Ford automobile in the afternoon, curing a mechanical problem concerning a loose wire; that later in the evening he had gone to the garage to put the Dodge away when he discovered his wife. He stated that defendant said he found his wife inside of the car, on the floor in front of the front seat, but on cross-examination admitted that the defendant had given him a partial written statement in the station in which he stated that he found his wife lying on the floor.

Sergeant Ryan testified that the defendant stated that he had recently obtained some pills; that while he was traveling, he believed he had discarded some in a toilet bowl in Minneapolis; that he did not know if his wife had taken any of those pills on February 3rd. The Sergeant did not look for the pills. He said the defendant told him the pills were his for a chest cold, and his wife had taken some but he did not know if she had taken any on the particular day of February 3rd.

Sergeant Ryan testified that defendant told him that he had filled the Ford's gas tank the night before, and that the change which was on the front seat was the change he had received from the gasoline attendant.

Dr. Bartley testified that he was a physician on duty in the emergency ward at the Elmhurst Hospital and that he examined Leone Richards upon her arrival on the night of February 3rd. He stated that she was

dead on arrival at the hospital, and it appeared that she had been dead at least an hour or two, this conclusion reached on the basis of his observation that her body temperature was slightly diminished, and that this was a wintry evening. He testified that he examined Mrs. Richards' body but did not find any marks, bruises, or lacerations on her head or other parts of her body; that he presumed she died from carbon-monoxide poisoning, based upon the history he received.

Dr. Hubert Swartout, a pathologist, testified for the State that, on the morning of February 4th, he performed an autopsy on the deceased. He confirmed that there were no marks or bruises on the exterior of the body: He diagnosed the cause of death as being from carbon-monoxide poisoning, in view of the color of the skin, the organs, and the muscles which were bright pink, a characteristic of death by this cause. He examined the stomach of the decedent and testified that it was empty; that the emptying time of the stomach varies, and that if a light meal is eaten, it would be empty in two hours, with a heavy meal, in four hours. He testified that it would be fair to say that she had not eaten for at least two hours and possibly as long as four hours. This would be a measurement from the time she died as there are very minimal digestive processes after death, he testified. He extracted a blood specimen from her body at the time of the autopsy.

Dr. Fiorese, Chief of the Bureau of Toxicology, State of Illinois, testified to his findings from the blood specimen of the decedent. The tests that were performed on the blood sample showed that saturation was 85% carbon monoxide in the blood of the decedent. Further tests indicated that Doriden, a sedative, was found in the blood of the decedent, having a concentration of 3.5 milligrams percent. He testified that Doriden starts to produce a sedative effect 15 to 20 minutes after ingestion; that a concentration of 3.5 milligrams percent would produce a

coma condition in a little more or less than one hour; that in a small person from 100 to 120 pounds, the concentration of Doriden found in the decedent's blood would probably indicate the ingestion of about 7 tablets. He further testified that, taking into consideration the dimensions of the garage and the specifications of the 1956 Ford automobile, the decedent would have died of carbon-monoxide poisoning within 40 minutes from the time the car was started within a closed garage.

Dr. Westfall, an obstetrician and gynecologist, testified that he had treated Leone Richards with reference to her last pregnancy; that she had delivered a baby boy on December 1, 1966, that he saw her on January 16th, 1967, for her six-week checkup and found her in good physical condition, and that she was approximately 5 feet tall and weighed approximately 110 pounds. The Doctor stated that when Mrs. Richards was in the hospital after the delivery of the baby, she was very concerned over the baby's condition, which was not normal due to a cleft lip. He stated that Mrs. Richards was always quite an apprehensive and emotional woman; however, when he saw her during the January 1967 checkup, she did not have this apprehension. He stated she seemed to be more cool, more resigned, and testified that "she just did not seem to be herself." At the January 16th examination he told her that there should be no problem with the surgical procedure for the cleft lip and, contrary to her ordinary practice, she did not ask a lot of questions about it.

Dr. Messitt, a physician on duty in the Elmhurst Hospital emergency room on January 28, 1967, testified that he saw Mr. Richards at about 11:00 a. m. on that date. Defendant was complaining of a chest cold and cough and the Doctor concluded that defendant had a residual laryngo-bronchitis from an upper respiratory infection that was probably viral in origin. He testified that he

prescribed a sulfa preparation, a cough preparation and Doriden. He prescribed Doriden because defendant had asked for something to help him sleep. He wrote a prescription for 14 tablets of Doriden, at a strength of one-half gram, or 500 milligrams. Defendant told him that he had had the complaints for approximately a week and a half to two weeks.

There was testimony that the prescriptions were filled by the pharmacy and picked up by the defendant on January 28, 1967.

A young girl, who was the babysitter for the Richards' children on the night prior to Mrs. Richards' death, testified that neither Mr. nor Mrs. Richards appeared any different to her on February 2nd than they had on any previous occasion.

Geraldine Johnson, a neighbor directly to the south of the Richards' home, testified for the State. She said that she and her husband were social friends of the Richards and that she had been a particularly good friend of the deceased. She had walked by the Richards' home at 8:30 p. m. on the night of February 2nd, noticed that the drapes were drawn and that there were no lights on in the house. She had never seen these drapes closed before. The first thing she did on the morning of February 3rd was to observe the Richards' home to see if the drapes were still drawn; they were. At about 1:00 p. m. she observed the defendant emerge from the front of his home carrying his son, Bart, in an infant seat; he placed the child in the rear seat of the automobile. The defendant then reentered the house and emerged from the front door, helping Leone Richards to the car, which had been backed into the driveway so that the passenger side was towards her house. The defendant walked directly behind his wife, holding her up by placing his hands and forearms under the elbows and forearms of his wife. The witness testified that Mrs.

323

Richards walked very slowly, dragging her feet and that her head was falling foward and remained down while she walked to the car. The passenger door was open and the defendant turned Leone Richards around, with her back to the car, sat her down in the front seat, picked up her feet and placed them in the car. The witness observed that Leone Richards' eyes were closed; that, as the defendant picked up her feet, her head went backward to the top of the seat and remained in that position while within the witness' scope of vision. After the car drove away, Mrs. Johnson immediately called another neighbor, Mrs. Zelinski.

Mrs. Johnson further testified that at about 2:30 p. m. she received a call from Mrs. Zelinski and, after talking to her, Mrs. Johnson called the Richards' home. The defendant answered, she asked to talk to his wife, and he told her that she was resting; Mrs. Johnson asked the defendant to get her up because she wanted to talk to her, and that he said, no, no, no, and that she asked to have Leone call back before the dinner hour.

Shortly after 3:00 p. m., Mrs. Johnson noticed the Ford, the front partially sticking out of the garage; the defendant was working under the hood and under the dashboard while she watched between 3:00 and 4:00 p. m. When her husband came home at 5:00 p. m., she noticed the Richards' garage was closed, that there were no lights in the back of the house at that time; she walked her dog past the Richards' house, observed that the house was still dark and the drapes still drawn, a small stove light was on in the kitchen and there was a light in the basement. She testified that the same conditions existed when she walked her dog at 5:30 p. m., when she looked again at 6:00 p. m. and at 6:30 p. m. on the occasion of another walk with her dog.

At 7:00 o'clock she again walked her dog past the Richards' home and observed the defendant in the driveway. She noticed that the garage door was closed; the

defendant was midway between the garage and the rear of the house, walking down the driveway toward the front of the house. At the time, the witness was standing on the sidewalk in the Richards' driveway, in front of the Richards' second car, which was parked in the driveway. When the defendant reached the front of the house, Mrs. Johnson called to her dog; the defendant looked up; Mrs. Johnson called out to him, by name; he did not answer but immediately turned around and ran up the length of his driveway and around the rear of his house, toward his back door. During this time, she did not see the Richards' pet dog.

Mrs. Johnson further testified that, at 7:30 p. m., she and her husband were outside in front of their house. She observed the Richards' front porch light on, a light on in the living room and the draperies open approximately one foot. These conditions were the same at 8:30 p. m. when she passed the Richards' home and saw the defendant, in his living room, pace six or seven times in front of the drapes. At 9:00 p. m. she observed the same thing. At 10:00 p. m. Mrs. Johnson was in the second story bathroom of her home and noticed the Richards' backyard lighted by floodlights. She saw Leone Richards lying on her back in the driveway, her feet toward the door and her head toward the street. The garage door was open and the Ford automobile was backed into the garage. The defendant was facing the street, leaning over Leone Richards' body; he picked her up by the wrists, lifted her back approximately one foot above the ground, and dropped her. He picked her up again in the same fashion and again, dropped her. She testified that defendant looked around after each time he dropped Leone Richards' body. Mrs. Johnson called to her husband, who immediately ran out and around the front of the Richards' home.

Mrs. Johnson testified to a conversation with defendant in her home the next day during which she asked

325

the defendant what had happened; that defendant told her it was an accident; that his wife had been going shopping, she must have been cold and started the engine to warm up in the garage; that she got out of the car to shut the door and must have fallen down and hit her head on the automatic door closer; that he had been down in the basement watching a program with his daughter. She asked him why Leone had taken the Ford when "she hated it so," and he said that the other car wasn't working quite right and he had not wanted her to use it.

Mrs. Pat Zelinski, a witness for the State, testified that she lived across the street and one house north of the Richards' residence and that on February 3rd she was with Mrs. Johnson until about noon. Mr. Richards called about 12:40 p. m. and asked if he could bring his daughter over and have her taken to school by Mrs. Zelinski. This arrangement was made and was not unusual inasmuch as Beth and the witness's daughter went to the same school and took tap dancing lessons together. Mrs. Zelinski took Beth and her daughter to school, picked them up from school and later took them to their tap dancing lesson. She brought Beth back to the Richards' home at about 4:45 in the afternoon.

At approximately 2:30 p. m., she saw the Richards' car drive by her house; it backed up into the Richards' driveway. As the car passed her house, she observed that Leone Richards' head was slumped down; that after the Ford parked in the Richards' driveway (approximately 200 feet from her living room window), she observed defendant help Mrs. Richards out of the car. She thought she saw Mrs. Richards move. She could not tell if they were talking. She testified that the defendant placed Mrs. Richards' arms over the car door and that her forearms extended over the open door; that her head was over the car door and looking downward. Mr. Richards took the baby out of the back seat of the

car and into the house, leaving Mrs. Richards in that position. He came out of the house and put his wife's one arm around his shoulder and his arm around her waist. Mrs. Zelinski's view was partially obstructed by the Ford and she could only see the head and shoulders of their bodies, but she saw them proceed to the house; Mrs. Richards' head was forward and it appeared that she walked up the steps and that she was not dragged. Mrs. Zelinski then called Mrs. Johnson.

She further testified that when she returned home from shopping just prior to 7:00 p. m., she observed the Richards' garage door open and the Ford backed into the garage. From her vantage point, which she estimated to be 300, 400 feet away, she saw no light in the garage. She also observed piles of snow, 3 or 4 feet high, along the driveway and the parkway.

Martha MacMillan, employed by an airline and formerly a stewardess, testified for the State concerning her relationship with the defendant. She stated that she first met defendant while attending an airline convention in 1961 and did not see him again until another airline convention in Miami in November of 1966. At that time they went out socially and the defendant told her that he loved her, that he and his wife were getting a divorce and that he wanted to marry her. Shortly after returning to her home in Pittsburgh, she received a telephone call from the defendant, and he continued to call her daily throughout the remainder of December, 1966, repeating that he loved her and wanted to see her. She testified that, by prearrangement, the defendant traveled to Pittsburgh in mid-December of 1966 and that they were intimate. A second meeting was arranged for December 31, 1966, when defendant had a flight; she flew to Omaha, Nebraska, met the defendant at his hotel and they were again intimate. He continued to call frequently during January; two additional prearranged meetings took place on January 17 and January 21, 1967, in Min-

327

neapolis, Minnesota, at the defendant's hotel room, where Miss MacMillan stayed.

She testified that, during the conversations in December, defendant had told her he wanted to marry her; in response to questioning, however, she could not remember how many times, but that it was "a lot, but I can't name a specific number." She said that the predominant subject of the January telephone conversations was that defendant was in love with her and that he wanted her to settle down and get married.

The witness further testified that, in the early part of February at 4:00 a. m. one morning, she received a telephone call from defendant wherein he told her there had been a terrible accident and that his wife was dead; that he didn't know whether it was an accident or suicide. Within 24 hours she received another call from the defendant in which he told her that his wife had died of carbon-monoxide poisoning, that "someone had found her in a car, and she was dead." During telephone conversations in February, he told her that he did not know what he was going to do with his children and that he was concerned about how he was going to take care of them.

According to Miss MacMillan's testimony, the defendant came to Pittsburgh to see her in February and stayed at her apartment, asked her to marry him and she said yes. They discussed a ring, and she told him she would like to have an emerald with diamonds on the sides. Toward the end of February, defendant came to Pittsburgh and brought his daughter; both stayed with Miss MacMillan at her apartment. During that stay, she and defendant had "a very bad argument" because defendant looked at some of her personal letters. In March he came to her building, but she refused to see him; the last conversation she had with him was in May when he called her.

328

Rosemary Davis, an acquaintance of the defendant and his wife for a period of years, testified for the State. She said that, in December and January, she saw the deceased several times and that she saw her about one week before her death; that on all of these occasions, deceased appeared fine and there was nothing unusual about her. She testified to a call that she made to the Richards' home on February 3rd; that when the defendant answered the phone, he told her his wife was resting and he did not want to disturb her. She said that on February 4th she talked with defendant and he said that he had found his wife lying there as he opened the garage door. In the conversation, defendant evidenced concern for his children and stated he did not know what he was going to do with them.

Mrs. Davis' husband, William Davis, testified for the State. His testimony, related to the mechanism and operation of the electronic garage door opener, revealed that it could be activated by an exterior key, by a button in the garage, or by the remote transmitter device; when power to the garage was turned off by an interior switch in the house, the automatic device was inoperable and the door could not be raised without pulling the safety chain, located 6 feet, 6 inches off the ground in the middle of the door. He had demonstrated the operation to Mrs. Richards and told her she should never get in the car, start it, and then open the doors. He confirmed his wife's testimony as to not observing anything unusual about Mrs. Richards prior to her death.

Elmer Andrews, a salesman of Peacock Jewelers, in Oakbrook, Illinois, testified that the defendant came to the store on February 10, 1967, interested in a ruby engagement ring, which they did not have in stock; that defendant returned on February 16th and was shown an $800 ruby ring which he selected; defendant made a $200 down payment. He testified that defendant said he

was presenting it to a young lady in California; that he would like it as quickly as possible; that he had lost his wife several months before.

The defendant testified in his own behalf. He said that on the day in question he and his wife did the usual household things, such as having breakfast and giving the children baths. He believed they both ate lunch on that day. He testified to the arrangement of having Mrs. Zelinski take Beth to school and to her dancing lesson; that before taking the child across the street, he started the Ford in preparation for a ride planned for that afternoon; that his wife, meanwhile, readied the baby. He took the baby out to the Ford, placed him in the back seat in a semireclining infant seat, and returned to assist his wife out of the house; that, with his hand around her arm, he walked behind her and to her side. He did not recall that his wife staggered or stumbled, but said that the front stoop, steps and sidewalk had snow and ice on them. He did not notice anything unusual about her when she was in the car; she was conscious and talking. After he got into the car, his wife requested that the baby be put in the front seat and, reaching over the seat, he placed the baby between them. He recounted a conversation with his wife during the course of the trip and said that his wife was sitting relatively erect as they passed Mrs. Zelinski's house, but that she may have been bent over talking to the baby. Upon their return, the defendant backed the automobile into the driveway and, after a short conversation with his wife, it was decided he would take the baby in before he helped her. Returning to the car, he took his wife's hand and helped her out of the car, holding her by the elbows as he walked her up the stairs. She walked in front of him as they both went into the house. They had been gone for approximately an hour and a half.

Thereafter, his wife unwrapped the baby; he and his wife started making formula, which he later finished. His

wife went downstairs to put a load of wash in the machine and, some time shortly before 3:00 p. m., she came upstairs and went to the bedroom to lie down; she napped until shortly after his daughter arrived home and the child woke her mother. While Mrs. Richards was sleeping, the defendant received three phone calls, one from Mrs. Johnson, one from Mrs. Davis, and one from a Mrs. Cotti; he advised all three that Mrs. Richards was taking a nap.

While Mrs. Richards napped, defendant worked on his Ford, removing a wire, hooked to a coil, which had been used as an electric tachometer. After Mrs. Richards awoke, at approximately 5:00 p. m., defendant, his daughter and his wife had something to eat. He and his daughter had a sandwich, his wife, breakfast cereal. After eating, the defendant and his daughter went to the recreation room in the basement, while Mrs. Richards stayed upstairs. Some time after 6:30 p. m., the defendant started up the basement stairs when he heard his wife shout to him that she was going out shopping. He observed her leave by the back door and recalls telling her to take the Ford. He also asked his wife to park the Ford in front and place the Dodge in the garage when she came home. After his wife left, he returned to the basement, going upstairs later to let the dog out. He whistled for the dog but it did not return, and the defendant went out the back door looking for it. He walked towards the street on the drive and spotted his dog, which ran back to the house. He trotted behind it and they both went in.

Defendant stated that he gave his daughter a bath, put her to bed, then watched T.V. At about 10:00 p. m., he turned on the lights in the backyard, walked to the front door and out of the house, got in the Dodge which he drove into the driveway; stopped the Dodge shortly before he got to the garage door, got out of the car, walked to the garage and opened it with the key switch;

331

the garage was filled with smoke and his wife was lying near the right front fender of the car on the floor of the garage. He dragged his wife out of the garage, got into the car and turned the key, then ran into the house and called the police department. He then came outside and attempted to pick his wife up but was unable to do so. As he grabbed her by the wrist, trying to drag her, he slipped and, he testified, he probably dropped her. He grasped her again and, after a period of time, got her to the backstairs. At this time Mr. Johnson appeared on the scene and defendant asked for his assistance. Together they lifted the body up the backstairs and placed it in the kitchen of the home.

Defendant denied that officer Hargraves brought him to the station. He said that he walked from the hospital to the station with his brother-in-law. This was confirmed by his brother-in-law.

Defendant stated that he did not hear Mrs. Johnson call his name. He stated that he measured the Ford from the ground level to the top of the door and found the distance was 59 inches. He denied making any proposal of marriage to Miss MacMillan prior to his wife's death, and denied telling her, at the Miami convention, that he was not happy, that he was going to get a divorce and that he was in love with her. He said that the December meeting with Miss MacMillan was in Chicago and not in Pittsburgh, and that his only proposal of marriage to Miss MacMillan was on February 14th. He testified that it was on that date that they discussed the type of ring she desired; that he was first in the Peacock store on February 15th, and that he ordered the ring the next day, February 16th; that the relationship with Miss MacMillan was broken by mutual consent and that he and his wife had never discussed divorce. He denied that he had killed his wife.

He denied that he requested a sleeping compound from Dr. Messitt, but stated that he did complain of having

trouble sleeping and that the Doctor volunteered prescribing the pills. In his testimony, defendant stated that he did not know whether his wife had taken any of the tablets or whether she was aware of them.

Several witnesses testified to defendant's good reputation for truth, veracity, peace and quiet.

Defendant's brother-in-law, Mr. Hollander, testified that it was not unusual to see the drapes closed in the Richards' front room; that Leone Richards had been upset and very apprehensive about her son's operation and the fact that she would not be permitted to see her child while in the hospital during this operation.

Defendant argues that he was not proven guilty beyond a reasonable doubt since the evidence was entirely circumstantial and could be resolved on a hypothesis of innocence. He relies on the rule that to warrant conviction on circumstantial evidence, it must be of a conclusive nature and tendency, leading on the whole to a satisfactory conclusion and producing a reasonable and moral certainty that the accused, and no one else, committed the crime, and that the conviction was not the result of passion and prejudice resulting from defendant's human failing, citing The People v. Dougard, 16 Ill2d 603, 158 NE2d 596 (1959), The People v. Wilson, 400 Ill 461, 480, 81 NE2d 211 (1948), The People v. Ahrling, 279 Ill 70, 80, 88, 116 NE 764 (1917) and Jumpertz v. People, 21 Ill 374 (1859).

The State argues that the court of review will not reverse a judgment of conviction unless the evidence is so palpably contrary to the verdict or so unreasonable, improbable or unsatisfactory as to justify entertaining a reasonable doubt as to the defendant's guilt, citing People v. Anderson, 104 Ill App2d 47, 242 NE2d 798 (1968). While the State denies that the conviction is based entirely upon circumstantial evidence, it argues that all of the evidence and circumstances taken together compel the conclusion of defendant's guilt; and that

proof of defendant's guilt beyond a reasonable doubt does not mean that the trier of fact is required to search out a series of potential explanations compatible with innocence and elevate them to the status of a reasonable doubt, citing The People v. Owens, 23 Ill2d 534, 538, 179 NE2d 630 (1962); cert den 370 US 947. See also, The People v. Dewey, 42 Ill2d 148, 158, 246 NE2d 232 (1969); The People v. Williams, 40 Ill2d 522, 526, 240 NE2d 645 (1968), cert den 393 US 1123; People v. Stoafer, 112 Ill App2d 198, 251 NE2d 108 (1969).

█ We are of the opinion that, within the purview of the authorities, the proof to establish the criminal agency, and the author of the criminal agency, is entirely circumstantial. We, however, believe all of the evidence and circumstances taken together, in conjunction with the reasonable inferences which may be drawn therefrom, do produce a reasonable and moral certainty that defendant, and no one else, committed the crime. While taken individually, many of the circumstances testified to are compatible with innocence, the totality of the record supports and impels a contrary conclusion.

The record thoroughly excludes the fact that some third person had access to decedent at any time in question. This is additionally supported by the evidence that there were no marks or bruises on the body.

Suicide is no more than a potential surmise and does not become a reasonable explanation in view of the testimony in the record (including defendant's own testimony) which indicated that decedent was happy and acted completely normal for a period of time prior to the day of her death.

The instrumentality causing the death was shown to be a combination of sleeping tablets and carbon-monoxide gas. There was evidence that Leone Richards was in a drugged condition on the afternoon of her death, which could account for her inability to extricate herself from

the garage. The undisputed fact that the drugs were those of defendant, together with the inferences which the jury could draw from the testimony of Mrs. Johnson and Mrs. Zelinski and the scientific testimony which would account for the decedent being in a coma and unable to walk, strongly point to a conclusion that she could not have walked out to the garage as defendant testified. While defendant characterizes the testimony of Mrs. Johnson and Mrs. Zelinski as the product of a heated imagination, the apparent suspicion of these observers is confirmed by the finding of the concentration of Doriden in decedent's blood.

There is no evidence of any observed activity of Leone Richards after 2:30 p. m. on the day of her death, except by the defendant; there is substantial evidence to justify the inference that she could not be aroused during the day and did not return the telephone calls as, according to the testimony, she normally would do. The observations of Mrs. Johnson and Mrs. Zelinski thoroughly lead to the conclusion that the decedent was in a drugged condition some time prior to the time that she went to the garage as defendant testified, and fairly excludes defendant's suggestion that she could have taken the tablets just before going there.

The testimony of Mrs. Johnson placed defendant within ten feet of the garage and walking from it at a time consistent with decedent's presence. The evidence that defendant set up the idle to cause the engine to run faster is a reasonable inference from his working on the car on the afternoon of the death. And his explanation that he worked on it the day, or two days, after the death to adjust the carburetor is inconsistent with the fact that Officer Troy found that the idle was already set high on February 3rd when he inspected the vehicle.

At the trial, defendant testified that he opened the door to the basement and observed his wife after she had

passed out of the house and while she was on the outside stairway. This was inconsistent with his statement to the police shortly after the occurrence that he was in the kitchen and held the door open for his wife to go out; it is also inconsistent with the testimony of Mrs. Davis and Mrs. Johnson in which they related that the defendant told them, the day after the occurrence, that he was downstairs in the basement at the time his wife left and it was for that reason he did not notice whether or not the car left the garage.

The jury could also consider that defendant's accounting for the number of Doriden tablets available for Leone Richards' ingestion on the day of her death, was inconsistent with the chemical and scientific evidence.

■ While the State is not required to prove a motive for a deliberate criminal act, the presence of a motive is important in considering the question whether a defendant did commit the act. The People v. Novotny, 371 Ill 58, 62, 20 NE2d 34 (1939). The testimony of Miss MacMillan supplied strong evidence of motive. The jury could properly determine her credibility and resolve the conflict between her testimony and that of defendant who admitted the affair but denied the proposals of marriage prior to his wife's death and particularly denied Miss MacMillan's testimony that he had told her of difficulties with his wife and of his wanting to get a divorce. The jury was also in a position to choose between the possible inferences based on the haste and circumstances in which defendant told Miss MacMillan of his wife's death and his admitted early proposal of marriage after the death.

■ While all of the circumstances are explained by the defendant's testimony as consistent with innocence, the jury was not bound to accept his testimony as true, particularly when it conflicted with reasonable inferences from other evidence and circumstances and, in itself, contained some inconsistencies.

336

We next consider defendant's claim of error in the court's refusal to grant a new trial based upon alleged newly discovered evidence. This claim relies upon testimony of Carl W. Hollander, a nephew of deceased, (and the son of Carl Hollander, defendant's brother-in-law who testified at the trial) taken in the course of the hearing on defendant's post-trial motion, heard on January 3, 1969.

Hollander testified that he had moved to Indianapolis in September, 1967, but had previously lived in Franklin Park, Illinois, and Addison, Illinois, and had known Mrs. Richards since her marriage to his uncle. He stated that on February 3, 1967, he was at a store on St. Charles Road in Elmhurst and saw Leone Richards sitting in a car; that he talked to her about her baby; that she asked if his wife could accompany her shopping and he explained they were in the process of moving. He noticed nothing unusual about Mrs. Richards and said she "appeared normal" and "acted completely normal." As a foundation for his testimony, he stated that he had served in the army as a medic and had many occasions to observe people under the influence of drugs.

He stated that he was aware of Mrs. Richards' death on the day which followed it, and related the incident only to his wife, until approximately two weeks before he testified. This was after the trial when defendant and the witness then told a lawyer for the defendant of the conversation. He said his parents had never told him of the fact that defendant was charged with the murder of his wife and that he was not told, nor was he aware of the trial, until Thanksgiving day of 1968 when he read an account in the paper and was alerted by the date of February 3rd, which was his birthdate.

On cross-examination, he stated he had seen his parents in 1968, but was not sure if it was more than a half dozen times; that he discussed Jack Richards with his parents but only relative to defendant's children;

that he was not told that his father had testified at the coroner's inquest; that at some time between February and Thanksgiving day in 1968, his parents had told him that Jack Richards had been indicted for something, but was not told what, and it was not discussed further. He said that his parents did not tell him of the trial or of his father's testimony at the trial. He saw defendant at Leone Richards' wake, but did not tell him of the conversation. He had not left the Chicago area until approximately six months after Leone Richards' death. He had no knowledge or experience with the effect of Doriden. He could not establish the time of his purported conversation with Leone Richards except that it was between 1:00 and 4:00 p. m. It was adduced that the witness had been under psychiatric care some three years prior to his testifying.

We find no error in the trial court's denial of the motion for a new trial based upon alleged newly discovered evidence. The evidence impeaches that portion of defendant's testimony in which he related the route of the drive he testified he took with his wife on the afternoon of February 3rd, and also that portion of his testimony in which he stated that they made no stops during the trip. It is cumulative as to that portion of defendant's testimony that his wife appeared normal on the afternoon of February 3rd, and, while it conflicts with the testimony of Mrs. Johnson and Mrs. Zelinski, there are inherent improbabilities which at best address the testimony to the court's discretion. We believe that the offered testimony does not appear to be of a conclusive nature which would probably change the result if a new trial were granted. Even the question of due diligence in discovering the evidence appears to us to be addressed to the court's discretion. The court did not abuse its discretion in denying the motion. The People v. Dukes, 19 Ill2d 532, 538–539, 169 NE2d 84 (1960), cert den 365 US 830; The People v. Baker, 16 Ill2d 364, 373–374, 158

NE2d (1959); The People v. LeMorte, 289 Ill 11, 21–24, 124 NE 301 (1919); People v. Burrington, 101 Ill App 2d 230, 234–235, 242 NE2d 433 (1968).

Defendant urges that various rulings of the trial court constituted prejudicial error:

(1) *Admission of blood samples taken from the body of deceased.* Defendant argues that the State failed to prove the chain of possession. Principally, this objection is based on the fact that the blood specimen of Leone Richards remained in a freezer located in a hall in the laboratory of Memorial Hospital in Elmhurst, Illinois, for some 17 days without a showing that the freezer was locked or otherwise secured, and without evidence to show that only authorized personnel had access to the freezer.

Dr. Swartout, a pathologist who drew the blood sample from the deceased body and testified for the State, was certain, on the basis of standard routine procedure, that the blood was put into a container by either himself or his assistant in his presence and at his direction, that the lid was screwed on tightly, that tape was put across the lid and around it so that the name of the patient and the autopsy number was written on the tape; that he or his assistant then took the container to a particular refrigerator which was assigned for specimens that were to be picked up later by the coroner. This was done on February 4, 1967. James Clark, the chief deputy coroner for DuPage County, testified that he picked up the specimen on February 21, 1967, from the freezer which Dr. Swartout had described and which was the customary location for such samples. He personally observed the attendant remove the specimen from the freezer, but did not identify the attendant. He put the bottle into a cardboard container and left it, intact, with a secretary at the office of the State Toxicologist.

Florence Rosenquist, secretary to Toxicologist, Dr. Fiorese, testified to having received the blood sample on

February 21, 1967. She was not sure who gave her the vial (whether it was Mr. Clark or Dr. Fiorese), and did not recall placing the specimen in the freezer or refrigerator. She later recalled that the specimen was delivered by Clark, but was not sure whether she or Dr. Fiorese first received it.

Dr. Fiorese testified that he oversaw the receipt of the blood specimen; that his secretary received it initially from Clark and notified him that it was in the process of being received. He said that he never handled such specimens until they had been numbered by his secretary. The specimen was numbered and a chemist's name put on it to assign it for evaluation; Dr. Fiorese supervised all tests run on such specimens. He testified that, upon receipt of such specimens, it was the practice to deposit the same in the refrigerator until the chemist, assigned to test the sample, was ready to analyze it.

Ronald Symusiak, a chemist, employed by the Bureau of Toxicology, testified that on February 21, 1967, James Clark brought the sample in. The witness obtained the sample from the blood bank, took the seal off and analyzed the substance.

There being an absence of any suggestion as to tampering, alteration or substitution in the record, we believe that the chain of custody was sufficiently proved. The People v. Washington, 41 Ill2d 16, 24, 241 NE2d 425 (1968); The People v. Anthony, 28 Ill2d 65, 68, 69, 190 NE2d 837 (1963); The People v. Harper, 26 Ill2d 85, 91, 185 NE2d 865 (1962), cert den 372 US 966.

(2) *Failure to grant a mistrial during the testimony of Geraldine Johnson.* During the direct examination of Geraldine Johnson, the prosecution asked the witness how the defendant's wife appeared to be. After objection by defendant's counsel to the use of the term "appeared" and a request of the court that the witness describe what she saw, the question was reread to the

340

witness. She then made the unresponsive answer, "she was very upset because her husband wanted a divorce." Defense counsel objected and moved the court for a mistrial which was denied. The court instructed the jury to disregard Mrs. Johnson's answer.

 In this connection, defendant relies on The People v. Gambino, 12 Ill2d 29, 34–37, 145 NE2d 42 (1957) which held that the question to be determined by the trial judge is whether the jurors have been influenced or prejudiced to such an extent that they could not be fair and impartial, and that in resolving the question, the judge must exercise sound discretion which is subject to review. Gambino involved possible prejudice by a newspaper article (and not by an isolated statement of a witness during trial) and affirmed the court's exercise of discretion. Defendant argues that the discretion must be reviewed in the context of the fact that the witness was obviously hostile toward the defendant. It is true that the court retired to chambers with counsel and remarked that "she is obviously got something to say, and she doesn't really care whether the question provokes the answer. I don't know what Mr. Laraia can do about it, and I don't know what else I can do. I have instructed the jury to disregard it." The court then had the witness brought into chambers; the witness related her nervousness and lack of understanding of court procedures, procedures were patiently explained by the court, and the court expressed the opinion that he believed the question was asked in good faith by the prosecution and that the direction to the jury to disregard the statement was sufficient to prevent prejudice. In the entering of the post-trial motion, the court also recognized that there was other ample evidence to indicate that the marriage between the parties was less than ideal. We believe that under all the circumstances the court exercised sound

341

judicial discretion in denying the motion for a retrial on this point.

■ (3) *Permitting Florence Rosenquist to testify although not endorsed on the list of State's witnesses.* The witness was offered to show a continuity of possession of the blood sample from deputy Clark to the Bureau of Toxicology. During the course of Dr. Fiorese's testimony, it became apparent that the blood of Leone Richards was received by his office through the person of Florence Rosenquist, his secretary. The State made her available to the defendant's counsel for examination and defendant did not move for a continuance on the ground of surprise or prejudice. It was within the court's sound discretion to permit the testimony under the circumstances. The People v. Poland, 22 Ill2d 175, 184, 174 NE2d 804 (1961) ; The People v. Welch, 22 Ill2d 558, 561, 177 NE2d 160 (1961).

(4) *Permitting Sergeant Ryan to relate statements made by defendant on February 3, 1967, with insufficient foundation laid concerning warning defendant of his constitutional rights.* Sergeant Ryan testified that at 11:00 p. m. on February 3, 1967, defendant and his brother-in-law, Carl Hollander, came to the police station from the hospital to which Leone Richards' body had been taken. The witness testified to a conversation with defendant and said that he first told defendant he could remain silent, that he was entitled to a lawyer, that if he could not afford a lawyer one would be furnished to him, and that anything he said could be used in a court of law.

The defendant urges that the interrogation was custodial under Miranda v. Arizona, 384 US 436, 16 L Ed2d 694, 86 S Ct 1602 (1966), and Orozco v. Texas, 394 US 324, 22 L Ed2d 311, 89 S Ct 1095 (1969) ; and that the warning given to defendant that he "could remain silent" is short of advising him clearly and unequivocably that he *has the right* to remain silent; that advising defendant that

342

anything he said "could" be used against him, falls short of an explanation that what he says "can and will be used" against him; and that advising defendant of his right to have a lawyer falls short of advice that defendant has that right to have counsel with him during interrogation.

The State counters that defendant was not in custody in terms of Miranda and Orozco; that by not objecting to Sergeant Ryan's testimony at trial, defendant waived the objection, but that in any event the warnings were sufficient.

█ Under The People v. Weinstein, 35 Ill2d 467, 471, 220 NE2d 432 (1966), and under Supreme Court Rule 615(a), both cited by defendant, we will consider substantial rights, even though not properly preserved at trial.

█ Under the circumstances here present, we find, however, that defendant *was not in custody* at the time of Sergeant Ryan's conversation with him. Defendant came to the station voluntarily. At the time, the autopsy had not been performed on Leone Richards' body and there is no evidence that Ryan was aware of foul play; defendant was not under arrest, nor held under circumstances which would indicate that he was not free to go at any time; there is no indication that defendant was then considered suspect. He was generally asked about what had happened during the day of February 3rd and volunteered various remarks which were not incriminating, although they did not, in all respects, conform to defendant's trial testimony. We do not consider Miranda and Orozco applicable under the facts, but find that the statements made by defendant to Sergeant Ryan were voluntarily made in response to general questions in a fact-finding process. People v. Milligan, 107 Ill App2d 58, 63, 64, 245 NE2d 551 (1969); People v. Routt, 100 Ill App2d 388, 392, 241 NE2d 206 (1968). See also, The People v. Howell, 44 Ill2d 264, 255 NE2d 435 (1970).

343

(5) *Failure to give certain instructions tendered by defendant.* Defendant claims error in the refusal of his instructions numbered "4 and/or 6" and 7. Defendant's instruction number 4, in effect, provided that if two conclusions can reasonably be drawn from the evidence, one of innocence, the other of guilt, the jury should adopt the conclusion of innocence. His instruction number 6, in effect, provided that a crime is never presumed where the conditions can be explained on an innocent hypothesis. Defendant's instruction number 7 provided that if all the facts and circumstances relied upon by the State to convict can be reasonably accounted for upon any theory consistent with the innocence of the defendant, the jury should acquit, citing as authority for the latter proposition, Marzen v. People, 173 Ill 43, 61, 50 NE 249 (1898).

The court, however, gave defendant's instruction number 11, which provided:

> "Circumstantial evidence is the proof of facts or circumstances which give rise to a reasonable inference of other facts which tend to show the guilt or innocence of the defendant. Circumstantial evidence could be considered by you together with all the other evidence in the case in arriving at your verdict.
> "You should not find the defendant guilty unless the facts and circumstances proved exclude every reasonable theory of innocence."

■ While defendant has abstracted only the above instructions, we have considered all of the instructions in the record and find that the ruling of the court was proper and that, as a whole, the jury was adequately instructed on the effect of circumstantial evidence and the requirement of proof of defendant's guilt beyond a reasonable doubt, in a case based upon circumstantial evidence to convict. Defendant's instruction number 11 is IPI

344

Criminal Instruction 3.02 and properly states the law. The defendant was not entitled to instructions in the nature of "two-theory instructions," or to repetitious instructions. The People v. Johnson, 317 Ill 430, 437–438, 148 NE 255 (1925) ; The People v. White, 308 Ill 210, 213, 139 NE 58 (1923) ; People v. Edwards, 74 Ill App2d 225, 231–233, 219 NE2d 382 (1966).

(6) *Prejudicial statements by prosecution during final argument.* Defendant urges that various remarks of the prosecutor in final argument were not based upon the evidence and were prejudicial, citing The People v. Weinstein, supra. After a thorough study of the arguments and the record, we find no substantial merit in that claim.

(7) *Allowing testimony of Dr. Fiorese, on matters in which he was not qualified as an expert.* Defendant argues that, since Dr. Fiorese stated his training to be 95% in chemistry and 5% in pharmacology, and since he was not a medical doctor, he should not have been permitted to express an opinion as to how long it would take the drug Doriden to induce a coma, nor how long it would take for someone to become asphyxiated and die from carbon monoxide within a garage approximating the dimensions of the Richards' garage.

██ The witness' background included a Ph.D. in organic chemistry with a specialization in bio-chemistry, plus continuous work, for the past 16 years, in the field of toxicology (Chief Medical Examiner for New York City for 10 years and Chief of the Bureau of Toxicology for the State of Illinois for 6 years). We find the objection was not well taken, and that the court properly admitted the testimony. The People v. Cox, 340 Ill 111, 116–117, 172 NE 64 (1930).

(8) *Undue restriction on the defendant in his cross-examination of the State's witnesses.* Defendant argues that he was unduly restricted in his attempt to elicit various particulars concerning alleged proposals of mar-

riage made by the defendant to the witness. The record does not sustain this contention. The court allowed the defendant great latitude in this area and properly excluded, as not material detail, proposals of marriage made to Miss MacMillan by persons other than the defendant.

■■■ (9) *The court erred in not dismissing the indictment order or in the alternative granting defendant's motion in arrest of judgment.* Defendant argues that the allegations in the indictment, that defendant "caused her to remain within a garage which became filled with carbon-monoxide gas," is not a particularization of an act committed by defendant which caused the death of his wife; further, that the indictment is defective in that it does not allege the date of the death of Leone Richards, and the indictment was returned more than a year and a day from the date of death. The indictment was in the language of the statute defining murder, which plainly describes the nature of the offense. In our opinion, the indictment sufficiently advised defendant of the place, time and means by which Leone Richards met her death. The People v. Tokoly, 313 Ill 177, 182–183, 144 NE 808 (1924) ; The People v. Williams, 7 Ill2d 271, 272, 130 NE2d 194 (1955) ; People v. Drink, 85 Ill App2d 202, 204, 229 NE2d 409 (1967).

(10) *The court failed to question the jury to determine whether they read or heard any publicity concerning the trial.* In this connection, we have taken with the case defendant's motion to amend the record on appeal by including newspaper accounts of the trial of the cause appearing in the community section of the Chicago Tribune, the Trib, published and circulated in DuPage County on November 20, 22, 25 and 27, 1968. We grant the motion.

Defendant concedes that he agreed to a stipulation not to sequester the jury during trial, and further admits that during the course of the trial, the trial judge ad-

monished the jury prior to each adjournment not to read any newspaper accounts of the trial, nor to listen to any radio or TV accounts. Defendant argues that the stipulation not to sequester the jury does not lessen what he describes as the heavy burden resting on the trial judge to insure that the jury is not exposed to news accounts of the trial which are of a prejudicial nature. It is the defendant's contention that the court has the duty to question the jury to determine whether or not they have read or heard any prejudicial publicity at every point in the trial where it is resumed pursuant to adjournment, *even though the defendant did not advise the court of the publicity during the course of the trial,* citing United States v. Nick Palermo, 410 F2d 468 (CA 7th 1969).

 We have examined the articles and find that they are largely factual and accurate in their accounting of the proceedings reported. While the headlines refer to the telling of a "love tryst," to the "other woman" testifying, and to the "paramour" testifying, and refer to the finding of drug traces in the dead woman, we do not find that the articles derogate the defendant or are otherwise inflammatory. In our opinion the publicity was not so grossly prejudicial that the trial judge was required to question the jury on his own initiative. United States v. Nick Palermo, supra; Margloes v. U. S., 407 F2d 727 (CA 7th 1969); U. S. v. Rizzo, 409 F2d 400 (CA 7th 1969). We further agree with the State's argument that a blanket assertion to the court that the jurors read the newspaper articles complained of is insufficient to raise the inference that the jurors had seen or read the articles. The People v. Gambino, supra, 36–37.

(11) *The court erred in denying a portion of defendant's motion for a bill of particulars.* Defendant argues that the court erred in denying portions of its motion for a bill of particulars, filed on May 12, 1968, which requested that the State specify in what manner it is alleged that defendant caused Leone V. Richards to re-

main within a garage, and which requested the names of persons, other than those appearing on the list of witnesses, known to the State as having witnessed the commission of the crime.

 The trial court properly ruled that the first portion of the motion was a request for evidentiary details which the State was not obliged to furnish in advance of trial. The People v. Sims, 393 Ill 238, 241–242, 66 NE 2d 86 (1946). Prior to trial, the People provided defendant with information as to the location of the garage alleged in the indictment, that the source of the carbon-monoxide gas mentioned in the indictment was from an automobile, that the manner in which the garage became filled with gas was from an automobile, and furnished the autopsy report which indicated death from carbon-monoxide poisoning. In addition, the State furnished the toxicologist's report indicating the presence of the carbon monoxide and Doriden in decedent's blood, and the defendant obtained a copy of the Coroner's inquest proceedings. The indictment and these disclosures were sufficient both for the accused's understanding of the nature of the charges against him and to enable him to prepare his defense; the court did not abuse its discretion in denying this portion of the motion.

 Nor did the court err in denying the remaining portion of the motion. There is no requirement that the State furnish defendant with the names of witnesses whom the State did not intend to call at trial. The People v. Ostrand, 35 Ill2d 520, 531, 221 NE2d 499 (1966).

We next review defendant's claim of prejudice directed at the State's failure to produce certain evidence and to make certain disclosures.

During the course of the prosecution's cross-examination of defendant, a series of questions was asked concerning Leone Richards' relatives in California, whether she customarily wrote to her aunt there, and whether defendant was familiar with his wife's handwriting. At

348

that point the prosecution asked the court reporter to mark People's Group Exhibit 9 for identification, which consisted of letter-sized photocopies. An objection was interposed by defendant's counsel that "the letter is obvious hearsay," and an argument was heard in chambers. It there appeared that the identified exhibit consisted of copies of two letters written by Leone Richards to her aunt in California on January 22, 1967.

The State advised the court that the letters would show her mental attitude with reference to no thought of suicide and with reference to her attitude about the deformity of the Richards' son. Defendant pointed out that defendant's testimony did not suggest that Leone Richards ever thought of suicide, but was directed only at "what he observed about her and how she thought about particular things." The court deferred its ruling since the exhibits had not been offered and, on the next court day, prosecution continued the cross-examination of the defendant on unrelated matters. There was no further reference to the exhibits before the jury.

Prior to final argument, in chambers, and after the court had considered numerous authorities cited by each of the parties, the judge stated that the exhibit was not before him directly because it was never offered and said, "but assuming they were offered, they would be refused." The court recognized an exception to the hearsay rule in his comments as to mental condition, but concluded that it would be impossible to separate other matters in the letters from the limited purpose for which they were offered and since all of the testimony, including that of defendant, related "to the splendid mental condition of the decedent," they would be refused.

 The defendant contends that the offer was of clearly improper evidence, that the only purpose of the State was to prejudice the defendant, and that this was accomplished by marking the exhibit in the presence of the jury. We cannot, however, reach that inference

349

from an examination of the arguments in chambers. We do not find that the jury would have been prejudiced by the mere marking of the exhibit in its presence when no further comment was made upon it.

 Defendant next claims that he was prejudiced by the State's failure to produce, under a general motion granted for discovery of tangible objects and physical evidence, certain "off-line pass requests," showing the request for air passage on the dates of defendant's meetings with Miss MacMillan, the letters which comprised People's Exhibit 9 for Identification, and the Peacock Jewelry Company store record concerning the purchase of an engagement ring.

As to the air-line pass requests, they were not in the possession of the State prior to trial and at all times were as available to the defendant as they were to the State. The letters were not introduced, as we have previously noted. The store records were not introduced and could have been secured by defendant, if desired. All of the items were of use only in the event defendant should testify or present a defense which would make them relevant, which the State could not anticipate prior to trial. We do not perceive that defendant was entitled to these items by his motion for discovery of tangible objects and physical evidence under the circumstances, or that he was prejudiced by failing to secure them prior to trial. The authorities cited by defendant, (The People v. Buzan, 351 Ill 610, 618–619, 184 NE 890 (1933) ; The People v. Gerold, 265 Ill 448, 469–471, 107 NE 165 (1914) ; and People v. Tribbett, 90 Ill App2d 296, 304, 232 NE2d 523 (1967), affirmed in The People v. Tribbett, 41 Ill2d 267, 242 NE2d 249 (1968)), are to no avail.

A further claim of prejudice is based on the failure of the State to disclose to defendant that Edwin A. Wolter, a detective for the Elmhurst Police Department, had

testified at the Coroner's inquest to a statement by Miss MacMillan that defendant proposed marriage prior to Leone Richards' death.

 An accused is entitled to production of evidence that is contradictory to the testimony of a prosecution witness. (The People v. Cagle, 41 Ill2d 528, 532–533, 244 NE2d 200 (1969)); and, ordinarily, to evidence in the possession of the prosecution which is favorable to a defendant. The People v. Cagle, supra; The People v. Moses, 11 Ill2d 84, 89, 142 NE2d 1 (1957); The People v. Cole, 30 Ill2d 375, 381, 196 NE2d 691 (1964); Giles v. Maryland, 386 US 66, 74, 17 L Ed2d 737, 87 S Ct 793 (1967); Brady v. Maryland, 373 US 83, 87, 10 L Ed 2d 215, 83 S Ct 1194 (1963); Napue v. Illinois, 360 US 264, 269, 3 L Ed2d 1217, 79 S Ct 1173 (1959); Jackson v. Wainwright, 390 F2d 288 (CA 5th 1968).

The record discloses that on or about October 27, 1967, defendant personally obtained a copy of the complete transcript of the Coroner's inquest which had been held on September 22, 1967, and completed on October 16, 1967. The information contained in the transcript was not, therefore, exclusively in the possession of the State. This is a relevant circumstance in determining the essential fairness of the proceedings, but would not necessarily be determinative if, in fact, the State had withheld material evidence which denied defendant a fair trial under constitutional standards. See U. S. v. Wilkins, 326 F2d 135.

The excerpt of Wolter's testimony at the Coroner's inquest included in the record is as follows:

"THE WITNESS: (Edwin Wolter)

"In Pittsburgh, Pennsylvania, I found a woman named Martha MacMillan who had been seeing Mr. Richards since November steadily.

"He made flights to Pittsburgh during the months of November, December, January, February and

351

March. In March this association terminated due to some problems that this woman had with Mr. Richards and him snooping into her private personal affairs.

"He proposed marriage to her. She was going to accept but later refused. He then came out there. . . ."

"BY DEPUTY CLARK:

Q. "Did you speak with her?"
A. "Yes, I spoke with her in Washington, D. C. on June 23rd."
Q. "What dates did she relate to the proposals of marriage?"
A. "I am sorry."
Q. "What date did she relate to this proposal—"
A. "This was in the month of March early."
Q. "I see."
A. "He proposed marriage. He even brought his young daughter, Beth, with him to Pittsburgh."

From the sketchy and incomplete nature of the inquiry, we cannot conclude that Wolter would testify that Miss MacMillan told him that defendant proposed to her "in early March" only at that time. We note that defendant testified that he first proposed marriage to Martha MacMillan on February 14, 1967, and related no other proposals; that Miss MacMillan testified that the last of defendant's proposals of marriage to her was in the middle of February, that they had a bad argument toward the end of February and the relationship was terminated, although defendant came to Pittsburgh to see her in March and she refused to see him.

▊▊▊ The defendant was on notice of the existence and nature of Wolter's testimony; a more substantial showing, that the State withheld evidence favorable to

defendant, is required, in our opinion, to justify a reversal on this ground.

■ Defendant also urges, in the alternative, that the sentence was excessive and that we should exercise our power to reduce it in view of defendant's lack of a prior criminal record and other circumstances. Defendant suggests that the sentence is the result of a harsh and punitive attitude on the part of the court and the jury. The court, however, could have imposed the death penalty (the jury's recommendation), and the reduction to a long term of years does not exhibit a punitive attitude on this record. It was within permissible limits, and justified by the circumstances of the crime which the jury found had been committed by the defendant.

■ It has been consistently held that where the punishment imposed is within the limitations prescribed by the legislature, it will not be disturbed unless it is at variance with the purpose and spirit of the law or manifestly in excess of the proscriptions of section 11 of Article II of the Illinois Constitution. This is so because the trial court is in a superior position to that of the courts of review in making a sound determination as to the punishment to be imposed. The People v. Hampton, 44 Ill2d 41, 48, 253 NE2d 385 (1969).

After reviewing the entire record we are satisfied that the evidence established defendant's guilt beyond a reasonable doubt, that he received a trial free from prejudicial error, and that the sentence imposed was proper.

The judgment of the circuit court is affirmed.

Judgment affirmed.

ABRAHAMSON and SEIDENFELD, JJ., concur.