(No. 40501.—

*In re* LEE ORR, Respondent.—(THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, *vs.* LEE ORR, Appellant.)

*Opinion filed November 30, 1967.*

418

WARD, J., took no part.

MARSHALL PATNER and PATRICK McNALLY, both of Chicago, (ALFRED R. LIPTON, of counsel,) for appellant.

WILLIAM G. CLARK, Attorney General, of Springfield, and JOHN J. STAMOS, State's Attorney, of Chicago, (FRED G. LEACH, Assistant Attorney General, and ELMER C. KISSANE and OLIVER D. FERGUSON, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE UNDERWOOD delivered the opinion of the court:

In this case as in *In re Urbasek*, No. 40411, decided this term, a juvenile adjudged delinquent seeks to raise substantial questions as to the effect of the decision of the United States Supreme Court in *In re Application of Gault*, 387 U.S. 1, 18 L. Ed. 2d 527, 87 S. Ct. 1428, upon proceed-

ings under the Illinois Juvenile Court Act (Ill. Rev. Stat. 1965, chap. 37, pars. 701—1 through 708—4) involving minors alleged to be delinquent. While respondent contends the *Miranda* rules relating to confessions and the constitutional and statutory provisions regarding bail in criminal cases are now applicable to delinquency proceedings, we find it unnecessary, for the reasons hereinafter set forth, to rule upon those issues.

Following an October, 1966, delinquency hearing in the circuit court of Cook County, Lee Orr (herein referred to as respondent), then 15 years old, was adjudged delinquent and committed to the Illinois Youth Commission based on a finding that he was guilty of involuntary manslaughter. He contends on appeal that his oral statement was admitted into evidence in violation of his constitutional rights and the notice provisions of the Juvenile Court Act, and that this Act was further violated when the trial court based its finding of delinquency solely on his uncorroborated statement. In addition, he seeks reversal of the order of the trial court denying *supersedeas* bond or bail pending appeal.

This case arose out of the death of Jerry L. Harvey from a gunshot wound occurring on September 24, 1966, at approximately 2:30 A.M. Respondent was arrested some 12 hours later at the apartment of his grandmother, Mrs. Irene Morgan. While the testimony regarding the circumstances of the arrest is not entirely consistent, it seems reasonably clear that officers Sherry and Kral, who arrested Orr, had been acquainted with him for several years through their work with boys in his area of Chicago. Respondent's mother apparently was living in Denver, Colorado. There is no mention in the record of a father. Respondent's guardian, at least *de facto,* was his grandmother with whom he and his sister lived in the grandmother's apartment.

Officer James Sherry testified that "We went to Lee Orr's home * * * and informed him what we were doing there." While respondent apparently knew why the

officers wanted him, and Officer Sherry so testified, there is no specific proof that respondent was formally told that he was being arrested or the reason therefor. Officer Sherry also said that the grandmother, who was present at the time of the arrest, was advised as to what was occurring. While the officer acknowledged that they did not advise her that respondent was being taken into custody, the grandmother testified she knew the boy was in custody but did not know where he was being taken. The officer also testified that Mrs. Morgan was aware her grandson was being arrested since the boy told her not to worry because "these fellows are friends of mine, and I'll be back." Officer Sherry further stated that Mrs. Morgan was again informed by telephone what was occurring after they arrived at the police station with respondent, that she told them she would come down to the station as soon as she found someone to care for a young child who was in the apartment, and that she arrived at the station an hour after the arrest.

This officer further testified that when they were walking down the apartment steps with respondent, Orr told them he was glad to see them and that, on the way to the station, respondent said "I tried to get in touch with you and your partner, and I got scared off. This has been on my chest since it happened. I want to get it off." The officer then related respondent's oral statement which, according to the officer, followed these remarks. The substance of this statement is that respondent met decedent on Cermak Road and went drinking with him, and that respondent shot Harvey while attempting to shoot over his head and frighten him into abandoning his idea that the two of them commit a robbery. Respondent was not advised that he had a right to remain silent prior to making his oral statement, but officer Sherry testified that the statement was not preceded by any questioning.

Officer Otto Kral, the other arresting officer, testified he rang the apartment bell from downstairs, identified him-

self and that respondent told them to come up to the apartment. The officers then walked into the apartment and placed handcuffs on respondent in his grandmother's presence. He was certain that Mrs. Morgan saw him place the handcuffs on respondent, although he did not tell her they were arresting Orr in connection with a murder investigation. Kral further testified that he asked Mrs. Morgan if she could come down to the station with them and that she replied she was not able to do so at that time. The officers agreed that Orr made his statement in the squad car on the way to the police station. Kral stated that about 10 to 15 minutes after respondent arrived at the first police station the boy was taken to a second one where he was allowed to call Mrs. Morgan, who respondent said was responsible for him, that respondent notified her he was down at 943 West Maxwell Street in the Homicide Section, and that she arrived on the scene 45 minutes to an hour later.

Mrs. Morgan testified that after one of the two officers entered and walked through her apartment, she asked him what he was doing, but that he simply turned and left and never did explain what was happening. She denied seeing handcuffs on her grandson, but admitted that she knew respondent was in custody although she was unaware of the reason. She further stated that "I made two or three calls and I called the police station, and they told me to hold on. They [sic] this boy called me."

The State produced two witnesses to corroborate respondent's confession. A counselor from the Better Boys Foundation, Arthur Christopher Williams, testified that respondent, who had been drinking, came to see him between 8 and 9 P.M. on the night of the shooting and told him: "I got a problem. * * * I got a guy outside, he want [sic] me to go stick up somebody, and you can see the shape I'm in. I don't want to go out messing around. * * * This cat got a shot gun out there. * * * If you go out and take it away from him, maybe he'll leave

me alone. He's been following me around all evening." Williams stated that he saw a boy standing outside but did not see a gun, and added that, pursuant to his advice, Orr agreed to go home. Williams said that he saw respondent again at about 9:00-9:15 that evening and that Orr then told him he was still with the same boy and asked Williams to take him home. Williams stated that no one was with Orr at this time, but said he saw a boy standing across the street. He further stated that he also saw Orr after the shooting, that Orr was scared on this occasion, and that, although respondent did not mention the shooting, he said. he was looking for Officers Kral and Sherry.

John Williams testified that the following morning Orr told· him he had put a shotgun under Williams's mattress, but did not explain why he had done so. He stated that Orr also said he had been with a boy from "somewhere around Cermak" and had taken the gun from him, but that Orr did not admit shooting the boy. Orr further told him "he was in some kind of trouble and had to run", but that Orr did not specify the kind of trouble.

Rosemary Coleman, the sister of John Williams, was called by respondent. She said that Orr and another boy were outside her brother's house around 11:15 P.M. on September 23; she saw something in respondent's pocket and asked to see it, discovering that it was a gun which was broken down into two parts. She stated that respondent had been drinking and was looking for her brother but said he would follow her advice and go home.

Respondent's first contention is that his confession was obtained in violation of *Miranda v. Arizona,* 384 U.S. 436, . 16 L. Ed. 2d 694, 86 S. Ct. 1602, specifically pointing to the admission by Officer Sherry that respondent was not advised of his right to remain silent prior to giving his oral statement. This argument is valid only if the *Miranda* ·standards were violated in this case, and if those standards were extended by *In re Application of Gault,* 387 U.S. 1,

18 L. Ed. 2d 527, 87 S. Ct. 1428 to delinquency proceedings under the Illinois Juvenile Court Act. We find it unnecessary, however, to reach the second of these questions (*People* v. *Perry,* 34 Ill.2d 229, 230; *People* v. *Sledge,* 25 Ill.2d 403, 404; *The City of Detroit* v. *Gould,* 12 Ill.2d 297, 304) since, in our opinion, it is clear that the use in evidence of the statement of respondent was not proscribed by *Miranda.* That case requires that "a person  *  *  *  taken into custody or otherwise deprived of his freedom of action in any significant way  *  *  .*, [p]rior to any questioning,  *  *  *  be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." (384 U.S. at 444, 16 L. Ed. 2d at 706, 86 S. Ct. 1602.) While Officer Sherry admitted that respondent was not advised of his right to remain silent prior to giving his oral statement, he also asserted, without contradiction, that no questioning preceded it. It is therefore apparent that the issue here is not the necessity of a warning prior to questioning, but its necessity before a spontaneous declaration may be received in evidence. Although we have not heretofore considered this question, our research discloses several cases in which other courts have done so. All agree that *Miranda* does not require police to interrupt a suspect in the process of making a spontaneous statement in order to warn him of his constitutional rights, and that a statement made in the absence of any questioning is not inadmissible by virtue of the failure to give such warning. (*Ballay* v. *People,* (Colo.) 419 P.2d 446, 449; *United States* v. *Cruz,* (W.D. Tex.) 265 F. Supp. 15, 20; *Diaz* v. *United States,* (E. D. La.), 264 F. Supp. 937, 945; *People* v. *Jones,* (D. C. A.), 52 Cal. Rptr. 924, 926; see also *State* v. *Hymore,* 9 Ohio St. 2d 122, 224 N.E.2d 126, 129.) In our opinion, these decisions are correct. In *Miranda,* the majority makes clear that its requirement is directed solely toward warnings prior to in-custody

interrogation, for, during the course of the opinion, it said (384 U.S. at 478, 16 L. Ed. 2d at 726) : "In dealing with statements obtained through interrogation, we do not purport to find all confessions inadmissible. Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." It is, perhaps, arguable that a statement by a 15-year-old boy is not spontaneous where he has been handcuffed and removed from his grandmother's apartment to a police squad car by two officers with whom he is seated on the way to the police station, but the indications here are to the contrary. Lee Orr knew the officers with whom he left and told his grandmother they were "his friends." There is testimony that he had been looking for them earlier, and it seems apparent that his statement to them regarding the shooting was the product of a compulsive conscience or otherwise psychologically motivated rather than the result of a coercive atmosphere. In any event it seems clear that it did not result from the type of situation at which *Miranda* was aimed. We accordingly conclude that respondent's constitutional rights were not violated by the admission into evidence of his confession.

Respondent next contends that his confession is inadmissible because the police failed to comply with section 3—2 of the Juvenile Court Act, which provides, in part: "(1) A law enforcement officer who takes a minor into

custody without a warrant under Section 3—1 shall immediately make a reasonable attempt to notify the parent or other person legally responsible for the minor's care or the person with whom the minor resides that the minor has been taken into custody and where he is being held." (Ill. Rev. Stat. 1965, chap. 37, par. 703—2.) Since the notice required by section 3—2 includes the place where a juvenile "is being held", it is apparent that this provision does not contemplate the giving of notice before the juvenile arrives at a place where he will remain for a significant period of time. Therefore, even if Orr was detained in violation of the section, the illegal detention began after he arrived at the police station, and, consequently, after he gave his oral statement. We have repeatedly held that "[I]llegal detention after a confession has been voluntarily given, will not relate back so as to render the confession inadmissible." (*People* v. *Musil,* 37 Ill.2d 373, 378; *People* v. *Palmer,* 31 Ill.2d 58, 68.) It is also of some significance in determining whether section 3—2 was violated that the record does not establish knowledge by the officers that the apartment was Mrs. Morgan's or that she was Orr's guardian until they arrived at the station. Actually, the record provides greater support for the conclusion that they learned these facts after they arrived, and prior thereto knew only that Mrs. Morgan was Orr's grandmother, and both officers testified that they invited her to accompany them to the station when they arrested respondent.

Nor do we find any merit in respondent's contention that he was declared delinquent solely upon his uncorroborated statement in violation of section 4—6 of the Juvenile Court Act (Ill. Rev. Stat. 1965, chap. 37, par. 704—6), for two of the State's witnesses and one of respondent's own witnesses testified concerning admissions by Orr and other circumstantial evidence which connected him with the September 24, 1966, shooting. Arthur Christopher Williams and Rosemary Coleman both saw

respondent a few hours before the shooting. Orr's remarks to the former are wholly in accord with the explanation he gave in his statement, and the latter found a gun in respondent's possession. Arthur Williams conversed with Orr again, on the day after the shooting, when respondent told him he was looking for Officers Kral and Sherry. Williams testified that Orr was scared at this time. John Williams, who also saw respondent the day after the shooting, said Orr admitted he was in trouble and also that he had been with a boy from "somewhere around Cermak" from whom he had taken a gun, which he had placed under John Williams's mattress.

Respondent's final argument is that the trial court erred in denying him bail pending appeal, and respondent urges that *Gault* imported into delinquency proceedings the constitutional provisions relating to bail in criminal cases. He therefore requests that we reverse the order of the trial court denying his request that he be released on bond during the appeal process. However, this question has now become moot and we have frequently refused to pass upon issues presented in that context. (*Mills* v. *Green,* 159 U.S. 651, 653; *Maywood Park Trotting Ass'n.* v. *Ill. Horse Racing Com.,* 15 Ill.2d 559, 563—4; *La Salle Nat. Bank* v. *City of Chicago,* 3 Ill.2d 375, 378—80.) For the reasons stated in those opinions we do not now consider the applicability of provisions for bail to delinquency proceedings under the Juvenile Court Act.

The judgment of the circuit court of Cook County is affirmed.

*Judgment affirmed.*

Mr. JUSTICE WARD took no part in the consideration or decision of this case.