The People of the State of Illinois, Plaintiff-Appellee, *v.* Maurice
Pendleton, Defendant-Appellant.

(No. 59062;

First District (1st Division)—November 27, 1974.

Paul Bradley and Steven Clark, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Patrick T. Driscoll, Jr., and Dorothy B. Johnson, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE EGAN delivered the opinion of the court:

A jury convicted the defendant, Maurice Pendleton, of the murder of Deborah Goodlow and acquitted him of the murder of Dewey Crockett; he was sentenced to 100 to 199 years in the penitentiary.

On March 31, 1970, Priscilla Gilchrist was employed at the Madison Park Hotel at 1380 East Hyde Park Boulevard in Chicago as a switchboard operator and desk clerk. Her job included "buzzing the door" for people who wished to enter the hotel. At about 3 A.M., Dewey Crockett and another man came to the door to get into the hotel. Since she did not recognize them, she rang the phone at the door and asked whom they wished to see. They wanted to see Deborah Goodlow in room 601. They called up to room 601 and Miss Gilchrist "buzzed" them in. Bonnie Sibbert, another desk clerk, then came in and talked with her. Shortly thereafter, Deborah Goodlow came downstairs screaming and said someone had been shot in her apartment. She appeared hysterical and ran outside after asking the two women for help. The man who had accompanied Crockett into the hotel walked out of the elevator and started toward the front door. He stopped because he heard knocking from across the lobby. He started toward the knocking and then went out the side exit on Madison Park Street that Miss Goodlow had used. The man was described to the police as between 6'1" and 6'2" tall, around 180 pounds, brown skin and wearing a black three-quarter length coat.

That morning Valley Morrison was in his apartment at 1330 East 51st Street which was about a half-block from the Madison Park Hotel. At about 3:50 A.M. he heard a woman screaming for help. He went to the window and saw a woman, later identified as Deborah Goodlow, running west on Madison Park Street with a man chasing her. She was running in a very frantic manner, but the man was overtaking her with ease. As the man closed the distance, she turned around and was shot in the upper body. The woman fell, and the man stooped over her and fired a second shot. Morrison yelled out the window, and the man looked up and then ran away. Morrison described the man as 6'1" or 6'2", 180 pounds, wearing a black, knee-length cashmere overcoat and a grey pair of slacks. Morrison was about 20 feet away and four short stories up from the actual place of the killing.

When the police arrived they found the body of Deborah Goodlow lying at 1329 East Madison Park. She was dead from a gunshot wound in the neck. They then went to room 601 at the Madison Park Hotel

and found the body of Dewey Crockett, dead of a gunshot wound of the head. He was a chronic narcotics user, and there was evidence of a recent injection. A pistol containing six unspent cartridges was found midway between Miss Goodlow's body and the hotel. The mobile unit of the Chicago Crime Detection Laboratory searched for fingerprints in room 601. Crockett's fingerprints were found on a glass; but the defendant's were not found anywhere. The evidence technician testified that "there were smudges and overlays that could not be identified."

Bonnie Sibbert identified the defendant as the man who followed Miss Goodlow from the hotel. She testified that she had seen him on several previous occasions when he came to visit apartment 601. Priscilla Gilchrist testified that the defendant resembled the man she saw follow Miss Goodlow through the lobby. When Valley Morrison was asked on direct examination if he could see anyone in the courtroom who resembled the man that fired the shots, he said that he could not. He was later recalled as a witness and testified that he had not understood the question previously asked of him and that the defendant resembled the man who fired the shots.

■■ The defendant contends that he was not proved guilty beyond a reasonable doubt. The identification by Miss Sibbert was not that of a passing stranger, but of someone who had seen him on previous occasions and who walked "right by him on [her] way back to the desk." Her positive identification is corroborated to some extent by Miss Gilchrist and Morrison, both of whom testified that the defendant resembled the man they saw. All three gave descriptions which fit the defendant. All three remembered that the man they saw wore a dark, three-quarter length coat. Miss Gilchrist identified it as a fur coat. Further corroboration was supplied by the deceased Crockett's father in two ways: First, he established that the defendant and his son were friends; and second, he remembered a dark, three-quarter length fur coat the defendant owned. Under this evidence the jury was justified in concluding that the defendant was the man who was in the room with Crockett and Goodlow when Crockett was killed and that he followed Miss Goodlow from the hotel. Although no one could testify directly that he was the man who fired the shot, we judge the circumstantial evidence was sufficient to establish his guilt beyond a reasonable doubt.

■■ The defendant in his original brief alleged that the gun found midway between the body of Miss Goodlow and the hotel had been admitted into evidence, and this ruling was assigned as error. The State, however, had withdrawn its request for the admission of the gun and the six unspent cartridges, and the gun was never admitted. In his reply brief the defendant concedes that his original argument was mistaken

in asserting that the gun had been admitted. His contention now is that reference to the gun prejudiced the jury. No case has been cited to support the defendant's position. Moreover, we fail to see how the evidence prejudiced the defendant, since it was conceded that the gun had not been fired and that the defendant's fingerprints were not found on it. Since it raised many unanswered questions, it was the type of evidence that could redound only in the defendant's favor. And we note that only the defense attorney referred to the gun in his final argument.

The court gave People's Instruction Number 13 (Illinois Pattern Instruction (Criminal) No. 3.04 (1968)) which provides as follows:

> "Motive is that which prompts a person to act. The State is not required to prove a motive for the commission of the crime charged."

The defendant refers to the comments of the instructions drafting committee and *People v. Manzella*, 56 Ill.2d 187, 306 N.E.2d 16, in support of his argument that it was error to give this instruction since, he alleges, the State did attempt to prove and did argue motive. The State's only argument in response is that the defendant did not preserve the question for review because of the nature of his objection at the conference on instructions.

During the trial Officer Janatto testified that he obtained a hypodermic needle, syringe, and a measuring cup or spoon from the apartment of Deborah Goodlow. During cross-examination of Janatto, the defense attorney inquired into the fact that the officer had kept the needle in his personal locker and had not filed an inventory of it. On redirect, the following occurred:

> "Q. In fact, Officer, were you not looking for a motive to this crime?
>
> A. Yes, sir.
>
> Q. In fact, Officer, besides the needle do you recall if there was some currency on the floor of that apartment, if you recall?
>
> A. There was currency. I do not recall whether it was on the floor or where it was.
>
> Q. Was that currency loose, if you recall?
>
> A. Yes, sir."

On recross the following occurred:

> "Q. When you said you were looking for motive, did you believe that perhaps narcotics were being sold in the apartment?
>
> A. We did not know."

■■ As noted previously, the pathologist who examined the body of Dewey Crockett testified that there was evidence that he was a chronic narcotics addict because of punctures indicating recent injection. On

direct examination Dr. Kearns, the pathologist who examined the body of Deborah Goodlow, was asked whether he saw any evidence of needle puncture wounds characteristic of a drug addict. He answered that he had not.

At the conference on instructions the following occurred:

"The Court: Mr. Xinos [defense attorney], have you received a copy of the State's instructions which they have tendered to me this morning, People's instruction 13, I.P.I. 3.04 is there any objection to that?

Mr. Xinos: Well, I would object to that, Judge.

The Court: What is your objection?

Mr. Xinos: Well, the same objection that the State has to the second paragraph of the circumstantial evidence instruction. Nobody said anything about motive, nobody said they had a motive. I do not think now we have to explain their case away by saying we cannot prove motive and don't have to."

At that point, the defendant insisted, and the State conceded, that motive had not been proved. That being so, the trial court's ruling was correct. Since he argued at the conference on instructions that motive had not been proved, the defendant may not now take the position that the instruction should not have been given because motive had been proved. See *People v. Jones*, 47 Ill.2d 135, 140, 265 N.E.2d 125.

■■ The defendant now points to the closing argument of the prosecutor as reason for refusing the instruction. He contends that the final argument did in fact attempt to show the jury that the State had established a motive which in some way involved the use of narcotics. The remarks complained of refer to money left in the room and drugs. But the prosecutor told the jury that the State did not have to show motive and conceded that since money was left in the room, it was not a robbery attempt. He added: "Whatever the reasons, why, whether it was about drugs, who had drugs, we do not know. We never know because, as I said before, Mr. Pendleton did away with the only witness." In our view, these remarks of the prosecutor in closing argument do not represent a position contrary to that taken by the State in the conference on instructions.

In his opening statement the prosecutor said: "Deborah Goodlow was pregnant at the time." After objection, the court struck the "reference to pregnancy" and instructed the jury to disregard it. The prosecutor then said: "We expect to show she was carrying fetus in her person." The court sustained an objection and again instructed the jury to disregard it. After a conference, out of the presence of the jury, the following occurred:

"State's Attorney: Respectfully, when the coroner says there is a live seven-month-old fetus in the body, it is part of the coroner's examination. I don't understand why it would be objectionable.

The Court: I don't think it is relevant.

State's Attorney: The coroner will testify to her physical identification. Her mother will testify her daughter was pregnant.

The Court: If it becomes relevant, we will allow it. Right now I don't perceive its relevance."

Officer Dunson testified that he took Deborah Goodlow's body to the morgue. The prosecutor asked if he noticed anything unusual about the body, and the officer replied that she was pregnant. Another objection was sustained, and the answer was stricken. Another conference out of the jury's presence was conducted. The prosecutor argued that the shots had mutilated Deborah Goodlow's face and the evidence of pregnancy would assist in identification and, further, that the evidence was relevant to show that she could not run fast and thus elude her pursuer. When the defense attorney agreed to stipulate to the identification, the court again instructed the jury to disregard any reference to pregnancy.

The next day, before Priscilla Gilchrist testified, the defense attorney made an "anticipatory objection" out of the presence of the jury. He stated that he was afraid that the witness would give testimony relative to the pregnancy. The court stated that it assumed that some evidence would show that the evidence of pregnancy was necessary, but it did not like to hear it in an opening statement. The prosecutor told the court that it was "absolutely necessary." The defense attorney repeated his objection on the grounds that the evidence was not relevant and was prejudicial. The court stated that it agreed. The prosecutor responded that the jury would want to know why the woman had been unable to run away from the man who killed her. The court stated that it would wait to see what would happen and rule on the problem as it arose.

Priscilla Gilchrist then testified that Deborah Goodlow was "standing there rubbing her stomach, because she was pregnant at the time." A defense objection was overruled. Gilchrist repeated her previous description and concluded, "I thought she was getting ready to have the baby." An objection by the defense attorney to what the witness "thought" was sustained. Later Bonnie Sibbert testified that "Deborah Goodlow was wearing a short green dress, like a maternity dress." Before the coroner's physician testified, the defense counsel made an objection out of the presence of the jury asking that the State be admonished not to make any reference to pregnancy. The prosecutor responded: "We have no intention of bringing that out. I do not know what his answer will be."

The court then said: "He has a right to testify to the body he examined. I am not going to attempt to tell him what he should not say." Dr. Kearns subsequently was permitted, over objection, to testify that Deborah Goodlow was 7 months pregnant.

■■ The State seeks to justify the admission of the evidence of Deborah Goodlow's pregnancy on the fact that it "explains her futile and thwarted escape from her assailant, when it is evidence that an otherwise slender, 20-year-old woman could have easily run to safety given the head start which Deborah had"; and on the fact that she was 7 months pregnant "contributed to and confirmed her identification." Both reasons are untenable. No question of identification was present; and the court ruled at one point, since the defendant stipulated to the identification, he would not permit the evidence. The comparative swiftness of foot of the deceased and the defendant was not in issue. The material fact is, if the defendant was the murderer, that he did catch up with the deceased, not the reason why he did; and her pregnancy and his fleetness were not material. The tenacity with which the prosecution pursued the right to introduce the evidence in the face of adverse rulings and the number of witnesses that were asked about her condition compel the conclusion that the only purpose was to create sympathy for the deceased and hostility to the defendant in the minds of the jurors. We note that in his closing argument the prosecutor said: "Once it got familiar to him, running around the street *killing pregnant girls* * * *." (Emphasis added.) We judge, therefore, that the evidence should not have been admitted. (See *People v. McCoy*, 80 Ill.App.2d 257, 260-261, 225 N.E.2d 123.) Whether its admission was such error as to require reversal or, as the State argues alternatively, was harmless will be discussed later in this opinion.

Officer Janatto testified that he obtained a hypodermic needle and a measuring spoon from apartment 601. He said that he received the needle at 4:30 the morning of the killings. For 2½ years the needle had been in his personal locker. It was never submitted to the crime detection laboratory, and no mention was made in any of the police reports that a needle had been found in the apartment. Janatto did not remember if he had picked it up or if it had been handed to him by one of several officers who were present. There were no efforts to take fingerprints from it, and there was no marking on the needle to show where it had been obtained or who had obtained it. He kept other evidence in his locker. He testified on cross-examination that he kept the needle to interrogate possible suspects. On recross, he testified that he did not know what significance it had in the case when he first received it. The first time he ever told anyone about the needle was about a year before

trial when he told an assistant State's attorney "in another courtroom." The needle was admitted into evidence over objection, and that ruling is assigned as error.

In support of its position the State cites *People v. Harper,* 26 Ill.2d 85, 185 N.E.2d 865; *People v. Wrona,* 7 Ill.App.3d 1, 286 N.E.2d 370; and *People v. Richards,* 120 Ill.App.2d 313, 256 N.E.2d 475. In *Harper,* narcotics were seized, tested, inventoried, sealed and taken to the crime laboratory. The sealed envelope was placed in a safe to which six people had access. In *Richards,* blood samples were taken from the deceased, put in a container, sealed and placed in a freezer for 17 days. The freezer was not locked or secured. In *Wrona,* two television sets were found in sealed cartons in the trunk of a car. The trunk was locked by the police, and the car taken to the sheriff's office. There the cartons were opened to check the serial numbers, and the cartons and the sets were placed in an evidence locker. The cartons and sets were identified at trial by the firm from which they were stolen. In all three cases the reviewing court held that in the absence of any indication of substitution or tampering, a proper foundation for admission had been established.

In addition to the factual distinctions between those cases and this one with respect to sealing and inventorying the evidence, there is one fatal foundation defect present in this case that was absent in those cases. The State, which has the burden of establishing a proper foundation for the admission of evidence, could not prove that the needle was in fact found in the apartment. Janatto could not say definitely whether he picked it up or it was given to him by another officer. If it was given to him by another officer, where that other officer found it is entirely speculative.

██ More in point is the case of *People v. Brown,* 3 Ill.App.3d 879, 881, 279 N.E.2d 382. In *Brown,* the defendant was convicted of driving under the influence of alcohol and with transporting an open bottle of liquor. The arresting officer testified he found a half-pint whiskey bottle on the floor of the car. He never inventoried the bottle; he did not mark it or seal it, and he kept it in his locker from the time of arrest until trial 4 months later. There was no testimony that he had sole access to his locker. The appellate court reversed, holding that the State failed to satisfy its burden of laying a proper foundation for the admission of the evidence. Similarly, we judge that the evidence the State presented here failed to satisfy its burden of establishing a proper foundation for the admission of the hypodermic needle and that its admission was error.

On the motion to suppress statements, Officer Lucious Moore testified that he questioned the defendant in a police station after he had been brought back from Texas. After warning the defendant of his *Miranda*

rights, he asked the defendant if he wished to make a statement, and the defendant answered that he did not wish to make a statement. Moore then asked if the defendant "wished to ask [him] any questions concerning the case." The defendant did not "respond immediately, but he did respond." At that point, no further questions were asked to disclose what the defendant said nor how long after the question of Moore he responded. After the motion to suppress had been denied, out of the presence of the jury, on motion of the defendant, Moore was instructed to refrain from testifying before the jury that the defendant was arrested in Texas on another charge and that the defendant refused to make a statement. Later, in the presence of the jury, the following occurred:

"State's Attorney: Q. Did you have occasion in that police station to ask Mr. Pendleton whether he had any question?

A. Yes, sir, I did.

Q. What was his answer?

A. He made no answer immediately. Shortly thereafter he stated that, he asked that, did we know what was in the hypodermic needle.

Q. And what did you do then?

A. I asked what hypodermic needle.

Q. What did he say, if anything?

A. He stated the hypodermic needle that was found over on Hyde Park."

No further questions were asked of the witness to explain how long an interval of time ensued between the first question he asked and the question of the defendant.

In his ruling on the motion to suppress statements the court said: "The defendant was fairly warned of his rights and understood them and voluntarily waived them if he made any statement." The defendant contends that this ruling was error.

The State relies on the following cases: *People v. Murphy*, 3 Ill.App. 3d 345, 277 N.E.2d 721; *People v. Landgham*, 122 Ill.App.2d 9, 257 N.E. 2d 484; and *People v. Jenkins*, 131 Ill.App.2d 49, 268 N.E.2d 198. In *Murphy*, the defendant was convicted of armed robbery. He was arrested with another man, a search of whose car disclosed a loaded carbine. A third man was arrested, and a gun recovered from his hotel room. All three were identified as the robbers. No question was raised in the reviewing court of the sufficiency of the evidence. A police officer testified that after he advised the defendants of their "rights," he told them they would be put in a lineup; he then asked them if the victims of the robbery would be able to identify them. The defendants answered, "He will, unless he's blind." The reviewing court rejected the contention

that the testimony was inadmissible under *Miranda*, noting that the defendant made no pretrial motion to suppress his statement and did not object to the testimony at trial. It added that, assuming a violation of *Miranda*, it was a "highly technical" violation and, in view of the nature of the other evidence against the defendants, was harmless beyond a reasonable doubt.

In *Landgham*, after discovering a child's body and tracing a pool of blood to the defendant's home, the police searched the home with the permission of the defendant's mother. Blood stains were found in the home, and the officers noted shoes with brown spots on them. The defendant told the officers the shoes were his. At that point the officers informed the defendant of his constitutional rights. The defendant then told the officers his 6-year-old step-brother had stabbed the deceased. After being taken to the police station, the defendant changed his story and told them he had an urge and stabbed the deceased. He later gave a written confession to an assistant State's attorney. The appellate court held that the first statements should have been suppressed but the subsequent written confession was properly admitted. In affirming the conviction, the court held that the statements improperly admitted did not establish anything that was not shown more strongly by other competent evidence. It concluded that in view of the overwhelming evidence of the defendant's guilt, the admission of the statements was harmless error.

In *Jenkins*, a police officer who was in a tavern saw the defendant push the deceased outside after an argument. Someone ran inside and told him, "He just killed her." The police officer ran out, saw the deceased lying on the street bleeding and pursued and arrested the defendant, who surrendered a knife. The police officer placed him under arrest and said, "You just killed a woman"; and the defendant responded, "The bitch needed killing." The appellate court held that the officer's remark at the time of arrest was merely explanatory and that the defendant's statement was spontaneous and voluntary. The court also noted that the defendant had waived the question by failing to object to the testimony of the officer.

None of the cases cited by the State is persuasive authority for its position here. *Jenkins*, it can be readily seen, did not involve custodial interrogation, as indicated by the court's reliance on *In re Orr*, 38 Ill.2d 417, 231 N.E.2d 424. In *Murphy*, unlike this case, the record does not show that the defendant refused to make a statement after being advised of his constitutional rights. Moreover, the court relied heavily on *People v. Doss*, 44 Ill.2d 541, 256 N.E.2d 753, wherein the Illinois Supreme Court upheld the admission of statements challenged under *Miranda*. The Seventh Circuit Court of Appeals subsequently reviewed a denial

of the defendant Doss' petition for writ of habeas corpus (*United States ex rel. Doss v. Bensinger* (7th Cir. 1972), 463 F.2d 576, *cert. denied* (1972), 409 U.S. 932). He had been advised of his *Miranda* rights and asked by the officers to waive them. He remained mute, refusing to give his name or age. He was confronted thereafter by his codefendant who told him he had confessed and then asked the defendant to show the police where a gun was hidden. Doss did so, and a motion to suppress the gun was later denied. The court of appeals reversed the denial of his petition and held:

> "We are of the opinion that such police-initiated action as evidenced in this case does not yield evidence which properly can be admitted absent some other affirmative indication by a defendant that he desires to waive his Fifth Amendment rights."

In *Miranda v. Arizona*, 384 U.S. 436, 16 L.Ed.2d 694, 86 S.Ct. 1602, the Court said (384 U.S. 436, 473-74):

> "Once warnings have been given the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise."

And the Court added (384 U.S. 436, 476):

> "Moreover, any evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege."

The question asked by Officer Moore after the defendant said he did not want to make a statement could have been intended only to start the defendant talking. Why else would Moore be interested to know if the defendant had "any questions concerning the case"? He had already been with the defendant for a long period of time on the trip back from Texas. And when the defendant said, "Did [you] know what was in the hypodermic needle?", the officer did not give an answer but asked another question, and a crucial one: "I asked, what hypodermic needle?"

We deem this form of interrogation to be a ruse designed to circumvent the mandate of *Miranda* which requires that "the interrogation must cease" when the individual indicates that he wishes to remain silent and which prevents admission of a statement if the accused was "tricked or cajoled into a waiver."

■■ In both *Murphy* and *Landgham*, the reviewing court found any violation of the *Miranda* rule harmless error in view of the overwhelming

evidence of guilt. The State advances that argument here. We judge otherwise. This case, it must be remembered, hinges on a single identification. When the one witness who saw the shooting, Valley Morrison, was asked if he could identify anyone as being the man or resembling the man that he saw, he answered: "No, I cannot." After leaving the stand, he later testified that he, a college teacher, did not understand the question. Bonnie Sibbert's identification, vital to the State's case, was strengthened by the fact that she had seen the defendant on many previous occasions. Yet she said that the day she testified could have been the first time she told anyone that she had seen the man before.

The hypodermic needle would have no probative value without the statement, and the statement would have no probative value without the needle. Together, however, they placed the defendant in the apartment and constituted strong corroboration of the identifying witness. We cannot, therefore, say that the admission of the defendant's statement was harmless beyond a reasonable doubt.

■■ In sum, we hold that the reference to the pregnancy to the deceased and the admission of the hypodermic needle and the statement of the defendant were cumulative errors that deprived the defendant of a fair trial. For these reasons, the judgment of the circuit court is reversed and the cause remanded for a new trial. Although we are remanding the case for a new trial, we deem it appropriate to pass on the defendant's contention that his sentence was excessive. In view of his past record and the heinous nature of the offense, we cannot say that the trial court abused its discretion in the imposition of sentence.

Judgment reversed and cause remanded.

BURKE and HALLETT, JJ., concur.