Nathaniel SPANN, Appellant,

v.

UNITED STATES, Appellee.

No. 86–953.

District of Columbia Court of Appeals.

Argued Nov. 16, 1988.
Decided Dec. 30, 1988.

Lisa Greenman, Public Defender Service, with whom James Klein, Public Defender Service, Washington, D.C., was on the brief, for appellant.

Roy W. McLeese, III, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and Michael W. Farrell and Elizabeth Tros-

man, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before NEWMAN, BELSON and TERRY, Associate Judges.

TERRY, Associate Judge:

Appellant was convicted of assault[1] and robbery.[2] On this appeal he presents no challenge to the assault conviction. His sole contention is that an inculpatory statement which he made at the time of his arrest should have been suppressed, on the ground that the statement was impermissibly elicited from him when a police officer asked the robbery victim[3] a question while the officer and the victim were standing only a few feet away from him. We hold that the police officer's conduct did not subject appellant to interrogation or its functional equivalent, and that the statement therefore was properly admitted into evidence. Accordingly, we affirm the judgment of conviction.[4]

## I

On the day after Thanksgiving Day 1984, shortly before noon, Robert Aiken and Jose Roman–Capdeville were working at a construction site near 17th and Fuller Streets, N.W., when they heard a woman scream. The men ran toward Mozart Place, where the scream had come from, and there they saw a woman pointing toward appellant, who was running at a "slow jog" down Mozart Place toward Euclid Street. Because appellant was "suspicious-looking," the two men followed him at a distance. At the corner of Mozart Place and Euclid Street, appellant turned left and headed toward 16th Street, intermittently slowing down to a walk and then speeding up to a jog.

At about the same time, Officer Lawrence Julian of the United States Secret Service was on his motorcycle, driving south on 16th Street, when he received a radio report that someone was hitting a woman on Mozart Place. As he approached the corner of 16th and Euclid, he saw Aiken and Roman–Capdeville pursuing appellant. When they saw Julian, they stopped and told him what they had seen and heard. Appellant by that time had crossed 16th Street and entered Meridian Hill Park, so Officer Julian headed his motorcycle in that direction.

Marina Fuentes was also walking through the park on her way to work. Just as Officer Julian entered the park, appellant ran up to Mrs. Fuentes and demanded her money and her purse. When she resisted, he hit her in the face, causing her to drop the purse to the ground. Appellant picked it up and opened it, but when he saw Officer Julian coming toward him on a motorcycle, he threw the purse into the bushes and ran. Julian gave chase and caught up with him on the east side of the park. Officer Julian got off his motorcycle and told appellant that he was under arrest for taking Mrs. Fuentes' purse. Just as the officer was putting handcuffs on him, before he even had a chance to advise him of his *Miranda*[5] rights, appellant spontaneously told Julian that he was trying to return the purse to Mrs. Fuentes, not to take it from her.

Meanwhile, two Metropolitan Police officers, Kevin Graves and Paul Swope, received a radio run in their scout car to assist a Secret Service officer at 16th and Euclid Streets. Graves and Swope re-

---

**1.** D.C.Code § 22–504 (1981).

**2.** D.C.Code § 22–2901 (1981).

**3.** The assault involved a different victim.

**4.** Appellant was also charged with assault with intent to commit rape, first-degree burglary, and second-degree theft. These charges were based on a series of incidents which occurred shortly before the robbery and involved a man matching appellant's description.

At the close of the government's case in chief, the trial court granted in part appellant's motion for judgment of acquittal on the charge of assault with intent to rape. The court ruled that there was insufficient evidence of an intent to rape and that it would instruct the jury only on the lesser included offense of assault. The jury acquitted appellant of that offense and of burglary and theft as well.

**5.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

sponded to the call. When they reached the scene of the arrest, Officer Julian was in the process of advising appellant of his rights. Officer Swope stayed with Julian and appellant, while Graves walked over to talk to Mrs. Fuentes, who was standing a short distance away. Because Fuentes' ability to speak English was limited, Graves enlisted the aid of a passerby, a Mr. Montez, to serve as an interpreter. Graves, Fuentes, and Montez were within six feet of appellant when Graves asked Fuentes, through Montez, whether appellant was the man who took her purse. Fuentes pointed to appellant and said, "That's the one." Immediately after Fuentes spoke these words, Graves testified, appellant "blurted out" that "he struck Nanny and [that] she owed him $30." Upon hearing appellant's statement, Graves moved the interview with Fuentes about twenty-five feet away, in an attempt to get out of earshot of appellant. There they were joined by Swope, who continued the interview while Graves returned to where Julian and appellant were standing and readvised appellant of his *Miranda* rights. Graves also recovered the purse from the bushes.

Appellant moved to suppress both the exculpatory statement he made to Officer Julian and the inculpatory statement he made to Officer Graves. After a hearing, the trial court ruled that neither statement would be suppressed because neither was the product of custodial interrogation. Appellant does not now contest the court's ruling with respect to the exculpatory statement, but he does maintain that the inculpatory statement should have been suppressed as a product of the functional equivalent of interrogation.

## II

Officer Julian advised appellant of his *Miranda* rights almost immediately upon arrest, but appellant said nothing in response. We need not decide what rights, if any, appellant may have invoked by his

silence, *see Morris v. United States,* 469 A.2d 432, 437 & n. 3 (D.C.1983), because we agree with the trial court that his subsequent inculpatory statement was not the product of interrogation.[6]

The procedural safeguards of *Miranda* apply not only to express custodial questioning but also to its "functional equivalent," *i.e.,* "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 1689–1690, 64 L.Ed.2d 297 (1980) (footnotes omitted); *see United States v. Alexander,* 428 A.2d 42, 51 (D.C.1981). Since appellant was never subjected to direct questioning by Officer Graves, we must decide whether Graves' on-the-scene interview with Mrs. Fuentes, the robbery victim, within earshot of appellant was the functional equivalent of interrogation. Our primary focus must be on appellant's perception of Graves' action; Graves' intent, though it must not be ignored, is of secondary importance. *Arizona v. Mauro,* 481 U.S. 520, 107 S.Ct. 1931, 1935, 95 L.Ed.2d 458 (1987); *Rhode Island v. Innis, supra,* 446 U.S. at 300–303, 100 S.Ct. at 1689–91; *Morris v. United States, supra,* 469 A.2d at 438.

It is obvious from the evidence that the challenged question and answer were merely part of a dialogue between the officer and the victim to which appellant's response was neither invited nor expected. *See Rhode Island v. Innis, supra,* 446 U.S. at 293–296, 302, 100 S.Ct. at 1686–1687, 1690 (conversation between two police officers sitting in front seat of police car with suspect seated in rear). Moreover, there is nothing in the record to suggest that Officer Graves' questioning of Mrs. Fuentes was either "the kind of psychological ploy that properly could be treated as the functional equivalent of interrogation," *Arizona v. Mauro, supra,* 107 S.Ct. at 1935 (footnote omitted), or a stratagem "that

---

**6.** The government does not dispute that appellant was in custody at the time he made the   statement.

reflected unfairness or vitiation of appellant's free will." *Fuller v. United States*, 132 U.S.App.D.C. 264, 278, 407 F.2d 1199, 1213 (1967), *cert. denied*, 393 U.S. 1120, 89 S.Ct. 999, 22 L.Ed.2d 125 (1969). Indeed, all the evidence is to the contrary.

The arrest scene was a confused one. Three officers, appellant, an excited and frightened victim, and an *ad hoc* interpreter had congregated together in a small area of Meridian Hill Park. Officer Graves did not bring Mrs. Fuentes to within earshot of appellant; she had walked over to the scene of the arrest on her own volition before Graves arrived. Indeed, when appellant blurted out his statement about having struck "Nanny" (apparently referring to Mrs. Fuentes) because she owed him $30, Graves moved Fuentes several feet away to a spot where he hoped to be out of earshot. Officer Graves' conduct simply cannot be compared to the intentionally coercive tactics which this court has disapproved in prior cases. *E.g., Derrington v. United States*, 488 A.2d 1314, 1325–1329 (D.C.1985) (while defendant was in custody at police headquarters, detective delivered a lengthy monologue which he admitted was intended to elicit a response from defendant), *cert. denied*, —— U.S. ——, 108 S.Ct. 1738, 100 L.Ed.2d 201 (1988); *In re E.G.*, 482 A.2d 1243, 1247–1248 (D.C.1984) (police lieutenant and defendant were alone when lieutenant said to defendant, "I wonder where the gun and the money is"); *Wilson v. United States*, 444 A.2d 25, 27–30 (D.C.1982) (detectives agreed upon a plan to talk to one another in defendant's presence, intending to elicit the kind of inculpatory statement that defendant eventually made); *United States v. Alexander, supra*, 428 A.2d at 49–51 (no one else present when detective spoke directly to defendant and said "We know what happened" or "We know you are responsible for the stabbing"; detective admitted to the court that he was using this technique to elicit an incriminating response).

Viewing the situation from appellant's standpoint, we think it highly unlikely that Officer Graves' question and Mrs. Fuentes' answer would arouse in appellant a compulsion to make an incriminating statement. Nevertheless, before we can decide whether the conversation between Graves and Fuentes was the functional equivalent of questioning, we must consider whether appellant had any peculiar susceptibilities and whether they were known to Officer Graves. *See Rhode Island v. Innis, supra*, 446 U.S. at 302–303, 100 S.Ct. at 1690–1691; *Derrington v. United States, supra*, 488 A.2d at 1328; *Hawkins v. United States*, 461 A.2d 1025, 1029–1031 (D.C. 1983), *cert. denied*, 464 U.S. 1052, 104 S.Ct. 734, 79 L.Ed.2d 193 (1984).

Appellant was coherent when he told Officer Julian that he was trying to return the purse, not to take it. Julian testified that he had no reason to suspect that appellant might be under the influence of drugs or alcohol, or suffering from any mental disability. Later, when Officer Graves read appellant his *Miranda* rights, he felt that appellant was able to understand them even though he appeared to be excited, was dirty and "raggedy-looking," and might have been "under the influence of some type of drug." Significantly, however, Graves neither spoke to appellant nor took custody of him until *after* he had blurted out the incriminating statement. Hence any possibility that drug use might have made appellant peculiarly likely to respond to any overheard comments, even though they were not directed at him, was not known to Officer Graves at the time he interviewed Mrs. Fuentes.

"[T]he definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." *Rhode Island v. Innis, supra*, 446 U.S. at 302, 100 S.Ct. at 1690 (footnote omitted; emphasis in original). This means that "the police will not be held accountable for unforeseeable results of their words or actions...." *Morris v. United States, supra*, 469 A.2d at 438 (citation omitted). When Graves began to talk to Fuentes, there was no indication that appellant might have been peculiarly susceptible to the stimulus of their conversation; consequently, the conversation be-

tween Graves and Fuentes cannot be regarded as interrogation or its functional equivalent. *See Hawkins v. United States, supra,* 461 A.2d at 1031. Appellant's volunteered statement that he struck Mrs. Fuentes and that she owed him $30 was therefore not the product of custodial interrogation, and *Miranda* does not require its exclusion.

AFFIRMED.