UNITED STATES, Appellant,

v.

Emanuel BROWN, Appellee.

No. 99–CO–269.

District of Columbia Court of Appeals.

Argued June 24, 1999.

Decided Aug. 5, 1999.

Valinda Jones, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney, and John R. Fisher, Michael T. Ambrosino, and Alan M. Boyd, Assistant United States Attorneys, were on the brief, for appellant.

Sandra K. Levick, Public Defender Service, with whom James Klein, Public Defender Service, was on the brief, for appellee.

Before SCHWELB, FARRELL, and RUIZ, Associate Judges.

FARRELL, Associate Judge:

The requirement that the police advise a suspect in accordance with *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), is triggered by custodial interrogation. *See id.* at 444, 86 S.Ct. 1602; *Rhode Island v. Innis,* 446 U.S. 291, 300, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). In this case there is no dispute that defendant Brown was in custody at the relevant time; the issue rather is whether he was "interrogated" before the police advised

him of his *Miranda* rights. The trial judge ruled that he was, and therefore suppressed incriminating statements Brown made in response to the interrogation. The government in this interlocutory appeal, *see* D.C.Code § 23–104(a)(1) (1996), contends that his statements were "[v]olunteered," *Miranda*, 384 U.S. at 478, 86 S.Ct. 1602, because the antecedent words and actions of the police were neither "express questioning [n]or its functional equivalent" as defined in *Innis, supra*. On the basis of the testimony credited by the trial court, we agree that the police did not interrogate Brown before he made the statements in question. We therefore reverse the suppression order.

## I.

Brown was indicted for first degree murder and related firearms offenses arising from the shooting death of Bernard Brown (no apparent relation). He moved to suppress, among other things, statements he had made to homicide detectives following his arrest for the murder which the government intended to introduce as false exculpatory statements.[1] The trial court held an evidentiary hearing on the motion, at which the sole witness was Kyle Cimiotti, the lead detective in the investigation of the Bernard Brown murder.

On May 30, 1998, five days after the murder, Cimiotti paged defendant Brown and, when Brown called back, told him that "we need to get together" or "you and I need to speak." Because Brown sounded "clueless" as to why the police were seeking him and asked what this was about, Cimiotti explained that they had an arrest warrant for him, though he did not say for what. Brown mentioned that "a bunch" of police with guns drawn had been to his mother's house earlier (presumably looking for him), and Cimiotti, stressing "the importance of [their] meeting," suggested they meet at the Sixth District police station to avoid "that whole rigamarole again ." Twenty minutes later, Brown arrived at the Sixth District where Cimiotti greeted him by saying "Emanuel" (to which Brown responded affirmatively) and "how are you doing?", identifying himself as Detective Cimiotti. Brown responded by placing his hands on the wall. He was handcuffed, and other officers drove him to the Homicide Branch while Cimiotti drove there separately in his car.

At the Homicide Branch, Cimiotti spoke with other police officers for 15–20 minutes, then, with his partner in the investigation, Detective Porter, entered the interview room to which Brown had been taken. Brown had not yet been booked or processed. Cimiotti introduced himself "formally" as Detective Cimiotti from the Homicide Branch and told Brown that he was "under arrest in connection with the death of a Mr. Bernard Brown." Then, according to Cimiotti, "without any reason or ... any provocation," Brown "just came out and said ['O]h, I heard about this, you know, they are trying to put that beef on me,"' adding that " 'I don't even know that boy"' and " '[I] wasn't even out there when this occurred."' Cimiotti again testified that "[t]he moment ... I explained to him that it was in reference to Bernard Brown, he spurted that out," "just sputtered [and] went on with it," denying that he knew the victim or was "even out there." Cimiotti "immediately stopped" Brown at that point, saying "you need to stop. I need to read you your rights. You have that right." Brown was then read his *Miranda* rights, and indicated on the rights card that he did not want to speak further without an attorney present. No additional relevant conversation took place.

In granting the motion to suppress Brown's statements, the trial judge stated:

I credit Detective Cimiotti's testimony entirely regarding how he contacted the Defendant; how he met the Defendant; how he directed other officers to transport the Defendant to his office; how he greeted the Defendant in his office and

---

1. *See Innis*, 446 U.S. at 301 n. 5, 100 S.Ct. 1682.

what he said to the Defendant and what the Defendant said to him.

I find all of that entirely credible and for me, it adds all up [*sic*].

I find no reason to discredit that testimony.

Nevertheless, after quoting the definition of "interrogation" in *Innis, supra,* the court concluded:

[T]hat controls the outcome of this motion because when the Defendant was placed in the Detective's office and the Detective came in and introduced himself, ... and when he told the Defendant why he was there, he should have foreseen that the Defendant was going to say something incriminating.

Accordingly, because he concluded that Brown was interrogated before the police advised him of his *Miranda* rights, the judge excluded his statements from use in the government's case-in-chief.

## II.

 We first discuss briefly our standard of review. The trial judge's determination that the police interrogated Brown before giving him the *Miranda* warnings is ultimately a conclusion of law that we review *de novo. See Reid v. United States,* 581 A.2d 359, 363 (D.C.1990). In doing so, however, we must defer to the judge's underlying factual findings (which we may not disturb unless clearly erroneous) and accept any reasonable inferences from the evidence he may have drawn in concluding as he did. *See Morris v. United States,* 728 A.2d 1210, 1215 (D.C.1999). The government asserts that reversal here would entail no quarrel with the judge's factual findings, because he "credit[ed] ... entire[ly]" Detective Cimiotti's account of his interaction with Brown. Brown, on the other hand, charges the government with recasting the evidence at points in its brief to portray a more benign, less coercive

interaction between the detective and the accused than the trial judge—drawing reasonable inferences—was obliged to accept. We conclude that, on the evidence credited by the judge, *and* drawing all reasonable inferences from it in favor of his ultimate conclusion, the judge nonetheless erred in concluding that the police interrogated Brown before he made his incriminating statements.

"[T]he *Miranda* safeguards," the Supreme Court held in *Innis,*

come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

*Innis,* 446 U.S. at 300–01, 100 S.Ct. 1682 (footnotes omitted). "The latter portion of this definition," the Court went on, "focuses primarily upon the perceptions of the suspect, rather than the intent of the police." *Id.* at 301, 100 S.Ct. 1682. Although the intent of the police "is [not] irrelevant," *id.* at 301 n. 7, 100 S.Ct. 1682,[2] the standard remains an objective one:

since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.

*Id.* at 301–02, 100 S.Ct. 1682 (emphasis in original; footnote omitted). In a court's application of this test, "[a]ny knowledge the police may have had concerning the unusual susceptibility of a defendant to a

---

**2.** "In particular, where a police practice is designed to elicit an incriminating response from the accused, it is unlikely that the practice will not also be one which the police

should have known was reasonably likely to have that effect." *Innis,* 446 U.S. at 301 n. 7, 100 S.Ct. 1682.

particular form of persuasion might be an important factor." *Id.* at 302 n. 8, 100 S.Ct. 1682.

The government, focusing on Cimiotti's words to Brown in the interview room, argues that it would be an extravagant application of the *Innis* standard to hold that merely by identifying himself and explaining to Brown why he had been arrested, Cimiotti engaged in interrogation. By way of illustration it points to *Hawkins v. United States*, 461 A.2d 1025 (D.C.1983), in which this court found no interrogation by a police sergeant who had told the arrestee (in an interview room) that "he was [t]here on a charge of homicide in reference to a shooting that had occurred on the prior date at 9:30 p.m., *and* that an investigation revealed that he was responsible." *Id.* at 1027 (emphasis added). We stressed the absence of any unusual susceptibilities to persuasion on the suspect's part of which the police should have been aware. *Id.* at 1030–31. Given the similar absence of such susceptibilities on the part of Brown, and statements considerably less "evocative" of a response than those in *Hawkins* (as nothing was said about the evidence against him), the government argues that the correct result here is dictated by *Hawkins* and other previous decisions. *See, e.g., Robertson v. United States*, 429 A.2d 192, 195 (D.C.1981) (officer's post-arrest question "[D]o you know why I'm here," not interrogation); *Bowler v. United States*, 480 A.2d 678, 680 n. 4 (D.C.1984) (officer was not reasonably likely to elicit response by telling accused, in response to question, that he was locked up because he had shot a man on Park Street).[3]

Brown responds that the government's focus on Cimiotti's words to him in the interview room ignores the broader context of their interaction,[4] beginning with Cimiotti's commanding statement to him on the phone an hour earlier that "you and I need to speak," followed by his arrest, handcuffing, and transport directly to an interview room at the Homicide Branch before being booked. He points also to Cimiotti's admission on the stand that in arresting Brown his purpose was "[e]ventually" to "question him and get a statement," and that it was not his way of "conduct[ing] ... business" to advise a suspect in custody of his *Miranda* rights before explaining why he was there and making him feel "comfortable" ("My next thing would have been does he need anything? Rest room? Perhaps something to eat and or drink?"). All of this, Brown asserts, made it possible for the trial judge reasonably to infer that Cimiotti had "engaged in his customary practice of enforced waiting in the Homicide interview room, formal introductions, then announcement of the charges, *because* it maximized the number of pre-warned 'spontaneous' incriminating responses" (emphasis added)—and that correspondingly, under *Innis*, the detective should have been aware of the reasonable likelihood it would have just that effect on Brown.

Our difficulty with Brown's position begins with its apparent assumption that the trial judge accepted his characterization of Cimiotti's intent. Since the judge made no express finding on the point, we cannot know for sure whether he saw the detective's "design" as the one Brown posits,

---

3. *See also State v. Jackson*, 28 Conn.App. 721, 613 A.2d 846, 849 (1992) (defendant informed at crime scene of arrest and charge was not subject to "coercive conduct designed to elicit an incriminating response"); *Clouse v. State*, 622 P.2d 720, 721 (Okla.Crim.App.1980) (defendant who turned himself in at sheriff's office and was subsequently informed of his arrest and charges before being given *Miranda* warnings was not interrogated); *Ramos v. State*, 806 P.2d 822, 828 (Wyo.1991) (defendant was not subjected to interrogation at police station by officer who "merely inform[ed him] of the charges against him when [he] made the statement").

4. At the same time Brown finds response-provoking (in the *Innis* sense) the fact that Cimiotti *named* the person in connection with whose death Brown had been arrested. Without more, we are not persuaded that merely naming the victim added significantly to the calculus of "interrogation."

*i.e.*, to circumvent *Miranda,* or something much less troubling—to facilitate, within constitutional bounds, a voluntary waiver of rights once administered. If anything, his findings favor the latter. Cimiotti insisted that he was aware of his duty under *Miranda* and, while admitting that he hoped "eventually" to obtain admissions from Brown, denied that his intent immediately on entering the room was to question him. *See Arizona v. Mauro,* 481 U.S. 520, 529, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987) ("Officers do not interrogate a suspect simply by hoping that he will incriminate himself."). The trial judge found "entirely credible" Cimiotti's version of the events. Imputing to the judge nonetheless an inference that Cimiotti, despite his sworn denial, had staged the events deliberately to induce a "prewarned 'spontaneous'" admission seems quite inconsistent with this finding .[5]

■ In any event, as *Innis* makes clear, while the detective's intent "must not be ignored, [it] is of secondary importance." *Spann v. United States,* 551 A.2d 1347, 1349 (D.C.1988). The primary focus is "upon the perceptions of the suspect, rather than the intent of the police." *Innis,* 446 U.S. at 301, 100 S.Ct. 1682. And that "requires us to make an objective evaluation of the normally foreseeable effect of [Cimiotti's] remarks" viewed in context. *Derrington,* 488 A.2d at 1326. In their aggregate, we are convinced that Cimiotti's words and actions precipitating Brown's admissions, although "str[iking] a responsive chord," *Innis,* 446 U.S. at 303, 100 S.Ct. 1682, did not rise above the "'subtle compulsion'" inherent in arrest which the *Innis* Court refused to equate with interrogation. *Id.*

■ First, the initiating events Brown relies on will not carry the weight he assigns them. Cimiotti's statement to him on the phone that they "need[ed] to speak" or "get together," followed by his arrest, did not make it foreseeable that Brown would likely incriminate himself when told only Cimiotti's name and affiliation and the reason why he had been arrested. Brown exaggerates the coercive effect of these events. He *chose* to meet the detective at the Sixth District station,[6] and once arrested, was transported to the Homicide Division without questioning. A half hour or more had elapsed since the original "command" to meet and talk. Although in all likelihood he knew the police wanted to interrogate him, nothing in the manner by which they took him into custody made the environment particularly coercive. Once at the Division, moreover, Brown was not held incommunicado for long before Cimiotti introduced himself. And the police did not "carr[y] on a lengthy harangue in [his] presence," *Innis,* 446 U.S. at 303, 100 S.Ct. 1682, did not expressly ask him anything, *id.* at 302, 100 S.Ct. 1682, did not even hint at the nature or strength of the evidence against him, *compare Hawkins, supra,* did not give him false or minimizing

5. Inferring such an intent from Cimiotti's words and actions would also go considerably beyond past decisions in which this court has relied on a police officer's subjective intent as supporting a conclusion of interrogation. *See, e.g., Morris, supra,* 728 A.2d at 1217 (detective acknowledged "he had decided to accuse Morris of sexually molesting [the victim] in order to see 'what kind of reaction I [would] get'"); *Derrington v. United States,* 488 A.2d 1314, 1329 (D.C.1985) (detective's remarks "were designed to elicit an incriminating response" where they "were intended 'to let [defendant] know that we knew he was the trigger man ... and I would like very much for him to tell me if he so desired'"); *Wilson v. United States,* 444 A.2d 25, 27, 28 (D.C.1982) (detective "admitted that his and [a second detective's] intent in engaging the [defendant] in conversation"—telling him a witness to the offense had implicated him— "was to induce his statement"); *United States v. Alexander,* 428 A.2d 42, 45 & n. 9 (D.C. 1981) (detective admitted his statement to accused that "'we know what happened' or 'we know you are responsible for the stabbing'" was "an interrogation technique designed to get her to talk").

6. For all that appears, he could have stayed at home and been arrested there, subjecting himself (and perhaps his mother) only to the "rigamarole" of a police show of force.

information about his plight, and did not even hold a "conversation" with him—"the first preparatory step of [a detective] experienced in conducting investigations," *Stewart,* 668 A.2d at 866. They did none of these things before he "just came out," in Cimiotti's words, and denied being at the scene of the killing or knowing the victim.[7]

Moreover, nothing in the record suggests Brown "was unusually disoriented or upset" or otherwise susceptible "to a particular form of persuasion." *Innis,* 446 U.S. at 302 n. 8, 303, 100 S.Ct. 1682. As the record reveals, Brown was a mature individual (37 years old) and had numerous prior arrests and therefore interactions with the police, whether or not he had been interrogated before. *Compare Derrington,* 488 A.2d at 1329 (19 year old suspect with prior felony conviction) *with In re E.G.,* 482 A.2d 1243, 1248 n. 6 (D.C. 1984) (14 year old suspect). Nor did he appear distraught, *see Alexander, supra* note 5, 428 A.2d at 47, 50 (suspect who had just stabbed her lover was "visibly upset"), or display any signs of drug or alcohol use, *see Spann,* 551 A.2d at 1350. That he was initially "clueless" about why the police insisted on meeting him and quickly "struck a submissive posture" at the Sixth District, falls well short of indicating a peculiar readiness to incriminate himself. Moreover, any alarm or anxiety Brown felt about the police showing up at his mother's home in force would have been largely dissipated by the non-coercive manner of the arrest and transport to the station.

It has been said that "merely advis[ing]" an accused that he is a suspect in a violent crime cannot be interrogation since, "[a]bsent such a prefatory statement, the [ensuing] delineation of *Miranda* rights would

have little meaning." *State v. Perez,* 422 A.2d 913, 915–16 (R.I.1980). But the key word is the qualifier "merely." Depending on context, the seemingly benign transmittal of information to an accused may resemble the kind of mental games that largely generated the *Miranda* decision itself. *See Innis,* 446 U.S. at 299, 100 S.Ct. 1682.[8] In this case, however, that context has not been demonstrated; Brown "was not subjected to compelling influences, psychological ploys, or direct questioning." *Mauro,* 481 U.S. at 529, 107 S.Ct. 1931. "Thus, his volunteered statements cannot properly be considered the result of police interrogation." *Id.*

The order of the Superior Court suppressing the statements is

*Reversed.*

---

**7.** Once Brown began speaking, Cimiotti was not required to interrupt him as he "spurted ... out" his statement. *See In re Orr,* 38 Ill.2d 417, 231 N.E.2d 424, 427 (1967); *State v. Tucker,* 81 Ohio St.3d 431, 692 N.E.2d 171, 177 (1998); *Commonwealth v. Avondet,* 439 Pa.Super. 421, 654 A.2d 587, 590 (1995).

**8.** For that reason, this court (per the Chief Judge) recently admonished the police in this jurisdiction about "the obvious impropriety," as well as the risk to prosecutions, in "the deliberate failure of the police to inform a criminal suspect *promptly* of his rights under *Miranda." Davis v. United States,* 724 A.2d 1163, 1170 (D.C.1998) (emphasis added).